**James H. ROCK, Appellant**

v.

**Alex W. RANGOS and Glen T. Meakem, Appellees.**

Superior Court of Pennsylvania.

Argued June 27, 2012.

Filed Jan. 24, 2013.

 

 

 

 

 

 

 

 

 

 

 

 

 

Gretchen E. Moore, Pittsburgh, for appellant.

Kevin P. Lucas, Pittsburgh, for Meakem, appellee.

J. Scott Kramer, Philadelphia, for Rangos, appellee.

BEFORE: OLSON, J., WECHT, J., and PLATT, J.*

OPINION BY WECHT, J.:

James H. Rock ("Appellant") appeals the trial court's order granting the motions for summary judgment filed by Alex W. Rangos and Glen T. Meakem (collectively,

* Retired Senior Judge assigned to the Superior Court.

"Appellees").[1] Having granted summary judgment, the trial court dismissed all of Appellant's claims. After careful review, we affirm.

## I. FACTUAL BACKGROUND

The trial court's recitation of the factual history of this case is extensive, as was inevitable in view of the complicated dealings and transactions underlying this case. In order to provide the reader with sufficient background, we reproduce at length below the relevant portion of the trial court's opinion:

> Akustica is a technology company founded [under the laws of the state of Delaware][2] in October 2001 by [Appellant] and Dr. Kaigham Gabriel.
>
> Akustica began as a startup company. Until its technology, products, and markets could be developed, it relied upon outside investors for the company's continued operations. The most likely outcome that Akustica always envisioned was the sale of the company to a large semiconductor company that could use its manufacturing capabilities to minimize production costs of the product and its existing distribution network and customer relationships to maximize sales volume.[3]
>
> Dr. Gabriel and [Appellant] had many conversations with [Appellees] as well as the rest of the investors and Board members about the above-described goals for Akustica.
>
> [Appellant] held shares of common stock and served as Akustica's CEO from Akustica's conception until his employment was terminated by the Board of Directors on August 5, 2008. [Appellant] was also a member of Akustica's

1. Where necessary, we will refer to the two Appellees individually as Appellee Rangos and Appellee Meakem. Appellee Rangos is not to be mistaken for other members of his family, who are among the *dramatis personae* in this matter, but are not parties to it. Where necessary, we will refer to these individuals by their full names.

2. Akustica's Third Amended and Restated Stockholders' Agreement provides that the agreement "shall be governed, construed and interpreted in accordance with the laws of the State of Delaware, without giving effect to principles of conflicts of law and choice of law that would cause the laws of any other jurisdiction to apply." *Id.* at 18. Appellant formerly expressed reservations regarding the application of Delaware law to some of the claims at bar. *See* Transcript, Oral Argument, 4/14/2011/ at 2–3 (acknowledging application of Delaware law to certain aspects of Appellant's breach of fiduciary claims, while attempting to carve out others, without resort to authority explaining same). However, relative to the issues we find preserved herein, all of which pertain to Appellant's claims for breach of fiduciary duty, Appellant relies exclusively upon Delaware law to make out his arguments. Indeed, Appellant's only citations to Pennsylvania law pertain to our standard of review. In addition, Appellant does not expressly contest the application of Delaware law to any of the issues he pursues here that are properly preserved for our review. Accordingly, we apply Delaware law to Appellant's claims. *Cf. Examen, Inc. v. VantagePoint Venture Partners 1996*, 873 A.2d 318, 323–24 (Del.Ch.2005) (applying Delaware law because Delaware corporations' "internal affairs" typically are governed by their state(s) of incorporation).

3. Appellant describes Akustica's technology as follows:

 > Akustica's patented CMOS (complementary metal oxide semiconductor) MEMS (micro-electro-mechanical) technology integrates the mechanical functionality of microphones and other sensors with analog and digital electronics all in a single microchip. Using this technology, Akustica developed and launched a series of innovative semiconductor products for consumer electronics markets such as the laptop computer and cell phone markets, including an award[-]winning 1mm by 1mm digital microphone that is ... touted as the "world's smallest microphone."

 Brief for Appellant at 6 (citation omitted).

Board of Directors throughout his employment.

[Appellee] Rangos was one of the members of the Akustica Board. The Rangos Family, prior to the Series C round financing transaction [4] challenged by [Appellant], owned approximately a 33% equity interest in Akustica. After the Series C financing, the Rangos Family owned more than 50% of the shareholder equity. (Plaintiff's Response Brief at 12, 20.)

[Appellee] Meakem served on Akustica's Board of Directors from the fall of 2002 through March 5, 2009. He was neither an officer nor an employee of Akustica and was not involved in its day-to-day activities and operations.

Prior to the Series C round financing transaction challenged by [Appellant] in this litigation, [Appellee] Meakem and his family held approximately an 8% equity interest in Akustica. This interest was diluted by approximately one-half as a result of the Series C financing transaction.

At all relevant times in 2008, Akustica had a seven-person Board. The Board included the following six individuals at all times: Akustica co-founder Dr. Gabriel, Ryan McIntyre, Ferdinand Kuznik, John Rangos, Jr., [Appellee] Rangos, and [Appellee] Meakem.[3] [Appellant] was also a director, at least until the termination of his employment as of August 5, 2008. [5]

[3] In April 2005, [Appellee] Rangos joined the Board of Akustica as the Series B Director. Mr. McIntyre, a principal in Mobius, also joined the Board at that time. At that time, the other Board members were John Rangos, Jr., Dr. Gabriel, [Appellee] Meakem, [Appellant], and Mr. Kuznik. The composition of the Board remained this way at least until August 2008.

Mr. Kuznik was a retired business executive with experience in the technology business. He was an independent outside director who was not an Akustica officer or employee and did not participate as an investor in the Series C round financing.

Mr. McIntyre was a principal of Mobius Technology Venture LP, which was a Series A5 round and Series B round preferred shareholder in Akustica and a lead investor (with the Rangos Family) in the Series C round financing.

4. For clarity's sake, a word is necessary regarding the terminology employed in this case concerning the mechanism by which capital is injected into a company in return for equity. As used herein, a "term sheet" is a documented proposal for such an investment. A term sheet that is contingent on certain events, e.g., the completion of due diligence, is not a binding contract. See, e.g., Certainteed Corp. v. Celotex Corp., No. Civ.A. 471, 2005 WL 217032, at *14 (Del.Ch. Jan. 24, 2005) ("Even in circumstances when commercial parties draft a term sheet that is intended to serve as a template for a formal contract, the law of this state, in general, prevents the enforcement of the term sheet as a contract if it is subject to future negotiations because it is, by definition, a mere agreement to agree.").

Typically, as in this case, the issuance of additional equity has the effect of diluting the relative share of equity held by prior investors. The term "pre-money valuation" refers to the value at which the company is assessed prior to the addition of the new investment, based upon which the new investor's equity is calculated. The designation of "series" in this case refers to classes of preferred stock, each of which comes with certain priority statuses pertaining to dividends and liquidation preferences.

5. The parties dispute whether Appellant's board membership continued after his August 5 termination. We do not find this to be relevant to the issues raised in this appeal. Hence, it need not be addressed.

Meakem Becker Venture Capital ("MBVC") was a venture capital fund cofounded by [Appellee] Meakem and David Becker to locate business opportunities in which to invest its investors' funds.

Between August 2002 and September 2003, Akustica closed five rounds of financing, issuing five series of preferred shares (Series A1–A5) in exchange for $12.5 million. Members of the Rangos Family participated in several of the Series A rounds. Participants providing the funding received shares of Akustica preferred stock in exchange for their investment. These preferred shares provided shareholders with liquidation preferences over common stockholders and with fixed dividends before dividends would be paid to common stockholders.

[Appellant] held only shares of common stock.

Following the Series A rounds of financing, Akustica continued to operate at a loss. Consequently, in March 2005, Akustica closed on a Series B round of financing under a term sheet submitted by John Rangos, Sr. based on valuing Akustica at $55 million.[4] The total investment for the Series B round was $17 million in additional capital.

[4] Mobius purchased shares equal to the number of shares purchased by John Rangos, Sr. and John Rangos, Jr. combined. (Plaintiff's App. Vol. II, Ex. 10.)

Shortly thereafter, Akustica engaged in another round of financing (Series B1 round) under a term sheet valuing Akustica a $72 million[,] which produced a total additional investment of $12.4 million.

Under the Third Amended Stockholder's Agreement executed in connection with these rounds of financing, the Rangos Family had contractual rights to appoint two of the seven directors, and they had acquired blocking rights which required its consent to certain significant corporate activity. These rights included that the company could not be sold, obtain secured credit, or issue equity securities without the consent of the Rangos Family. (Plaintiff's Appendix Vol. II, Ex. 26.)

Following the Series B rounds of financing, Akustica continued to need working capital. On January 10, 2008, the Rangos Family and Mobius provided a total of $3 million in bridge loans.

At a January 22, 2008 Board meeting, [Appellant] and Dr. Gabriel presented a 2008 budget which projected that for 2008 Akustica would have total revenue of $13.3 million and a positive gross margin in excess of $1 million. (Plaintiff's Appendix Vol. IV, Ex. 77 at 36.)

A Series C round of financing was considered at a February 25, 2008 meeting of the [B]oard. At this time, Akustica had very limited working capital. (Plaintiff's App. Vol. I, Ex. D, February 21, 2011 Affidavit of James H. Rock.) Prior to the meeting, on or about February 14, 2008, [Appellant] circulated to the Board an unsigned Draft Term Sheet from [venture capital firm] Paladin based on a $70 million pre-money valuation, contemplating a $10 million investment from Paladin with an additional $5 million to $10 million from existing investors. (Plaintiff's App. Vol. I, Ex. D at ¶ 29–30; see Plaintiff's App. Vol. III, Ex. 50.)

Shortly thereafter, MBVC submitted a term sheet for the Series C financing based on a pre-money valuation of the company at $50 million; this term sheet contemplated a $9 million investment by members of the Rangos Family and an $8 million investment from other investors, including MBVC and Mobius.

Shortly before the February 25, 2008 meeting, a signed term sheet for financing to be led by members of the Rangos Family in conjunction with Mobius was submitted. The term sheet was based on a $60 million value and provided for funding of $14 million. (Plaintiff's App. Vol. III, Ex. 50.)

The purpose of the February 25, 2008 meeting was for Akustica to respond to these term sheets. Four of the seven Board members were conflicted (Rangos/Mobius Term Sheet—[Appellee Rangos, John Rangos, Jr.,] and McIntyre; MBVC Term Sheet—[Appellee] Meakem). Consequently, the Board voted that only the remaining three directors ([Appellant]; Dr. Gabriel, and Mr. Kuznik) would act for Akustica. Initially, these directors decided not to pursue the term sheet of MBVC either because it was inferior to the others or because [Appellee] Meakem advised the three Board members that he was withdrawing his term sheet and giving consideration to participating in the Rangos Term Sheet.[6]

[6] [Appellee] Meakem could not bind MBVC so at the February 25, 2008 meeting he could only express an interest in participating in the Rangos Term Sheet. Subsequently, MBVC agreed, subject to due diligence, to participate in the contemplated Series C round financing pursuant to the Rangos/Mobius Term Sheet.

The three directors next considered the Rangos/Mobius and Paladin Term Sheets. Subsequently, at this same meeting, the Board at the recommendation of the three independent directors unanimously approved the Rangos/Mobius Term Sheet.

According to the February 21, 2011 Affidavit of [Appellant] (Plaintiff's App. Vol. I, Ex. D), the proposed value of $70 million in the Paladin Term Sheet combined with certain limitations on liquidation preferences, resulted in little difference between the Rangos Family Term Sheet and the Paladin Term Sheet on the issue of valuation and dilution of common shareholders (¶ 37).[7] As a Board member, [Appellant] had no alternative other than to vote to accept the Rangos Family led Term Sheet as its terms were, overall, superior to the Paladin Term Sheet and there was not going to be an opportunity to seek better terms from Paladin (¶ 43).

[7] Affidavits of David Aronoff (Exhibit A), H. Lee Buchanan (Exhibit B), Dr. Gabriel (Exhibit C), and [Appellant] (Exhibit D) are found in Appendix of Plaintiff's Exhibits in Support of its Opposition to the Motion—Vol. I.

A term sheet is not a contract. It is a non[-]binding summary of terms subject to further refinement and due diligence. After a term sheet is signed, the potential lender will conduct due diligence. It is anticipated that the financing will be provided at the completion of due diligence as set forth in the term sheet if there [have] been no materially adverse changes from what was represented or otherwise anticipated when the term sheet was accepted by Akustica.

As of February 25, 2008, Akustica had never been audited. (Plaintiff's App. Vol. I, Ex. D ¶ 7.) At a date after February 25, 2008, the Rangos Family (but not MBVC or [Appellee] Meakem) stated that its due diligence would not be completed until an anticipated audit was available. (Plaintiff's App. Vol. I, Ex. D ¶¶ 52, 56, 57.) The audit was not provided until early June.

By May 2008, Akustica needed additional funds to allow it to operate. [Appellant] personally solicited [Appellee] Meakem, and at the request of [Appel-

lant], [Appellee] Meakem agreed to make a $1 million bridge loan. The funds were delivered on May 29, 2008 pursuant to a secured promissory note that furnished a security interest giving MBVC a first lien on all of Akustica's personal property. Payment was due no later than July 10, 2008.

The next day (May 30, 2008), [Appellant] sent an email to the Board revising revenue projections downward by more than 60%. Thus, for 2008 the company's gross margin was now projected to be approximately negative $3 million instead of plus $1 million. [6]

\* \* \*

At approximately the same time the projections were updated, there was made available to Rangos, Mobius, and MBVC a draft of a first ever audit of Akustica[,] which indicated that actual revenues were less than the 2007 revenues furnished to the Board in January 2008, that Akustica had accumulated a deficit as of December 31, 2007 of almost $40 million, and that it continued to sell products at significant negative gross margins. (Rangos App. Vol. II, Exs. 32–33 at 2.)

Subsequently, on or before June 27, 2008, MBVC advised [Appellee] Rangos and Mr. McIntyre (of Mobius) that it would not participate in the Series C funding. Thereafter, on the same day the Rangos Family notified [Appellant] that neither the Rangos Family nor Mobius would proceed with the [first] Rangos/Mobius Term Sheet [approved, subject to due diligence, on February 25, 2008], and they would advise at a later date as to what terms, if any, they might be willing to proceed with any Series C round of financing.

At an August 5, 2008, Board meeting, the Board terminated [Appellant's] employment and elected Joseph A. Jacobson, who was serving as the Chief Financial Officer, as Akustica's new president and Chief Executive Officer.

On August 8, 2008, the members of the Rangos Family and Mobius submitted a revised proposed Series C round term sheet based on a $15 million pre-money valuation of Akustica. This term sheet provided for an investment of $15 million to purchase half of Akustica's stock. At an August 12, 2008 Board meeting, the Board, without dissent, voted to go forward with the issuance of the Series C round stock under the terms of the August 8, 2008 Term Sheet as Revised ("Term Sheet II"). (Rangos App. Vol. III, Ex. 68.) Prior to the August 12, 2008 meeting, Mr. Jacobson (the new CEO), Dr. Gabriel, and Mr. Kuznik participated in a telephone conference to consider the term sheet.

[Appellee] Meakem did not attend or otherwise participate in the meeting. Furthermore, prior to the meeting, MBVC stated that it would not participate in any financing under a revised term sheet.

[Term Sheet II] provided that the closing was contingent upon Mobius, Akustica, and members of the Rangos Family reaching an agreement with MBVC as to the treatment of the $1 million MBVC loan (which was now in default). The

6. The trial court provides a chart detailing revenue and margin projections for 2008–2010, inclusive, as presented in January 2008, and as updated in June and July of that year. Collectively, these projections reveal severe reductions in anticipated revenues for the then-current year and two years to come. As of July 16, 2008, the downward revisions from the January 2008 projections had been reduced further across the board, anywhere from a 49.7% reduction in projected revenue for 2010 to a 358% reduction in projected gross margin for 2008. *See* Trial Court Opinion, 10/13/2011, at 8.

Series C round investors did not want any secured debt on Akustica's books while MBVC was unwilling to convert the loan into Series C round financing equity. Eventually, the Rangos Family and Mobius each agreed to increase their investment in the Rangos/Mobius Term Sheet II by $500,000 in order to fund Akustica's payment of the $1 million loan. Thus, the amount of Series C round financing to be provided by the Rangos Family and Mobius increased from $15 million to $16 million.

At a September 11, 2008 Board meeting (conducted by means of a telephone conference) at which all Board members were present, the Board unanimously approved and adopted resolutions to authorize the issuance of the Series C round preferred stock under the previously approved August 12, 2008 ... Term Sheet [II] subject to approval by the stockholders (including prior Series A round shareholders). Since neither [Appellee] Meakem nor MBVC chose to participate as an investor in the ... Term Sheet II ... transaction, their equity ownership, as well as the ownership of the other Series A shareholders, including [Appellant], was reduced by approximately 50%.

Since shareholder interests would be diluted by 50%, shareholder approval was needed to approve the Series C financing. On September 25, 2008 the company obtained the requisite shareholder approval to close the Series C financing. On October 3, 2008, Texas Instruments ["TI"] issued a letter of interest which indicated an interest in purchasing Akustica for $75 to $85 million subject to various conditions, including due diligence. (Plaintiff's App. Ex. 208.) After Akustica had signed a letter of interest, [TI] commenced due diligence. On November 12, 2008, [TI] advised Akustica that it would not pursue its acquisition

of Akustica under any terms. (Rangos' App. Ex. 78 at 9, Ex. 81.)

At a December 4, 2008 Board meeting, the Board voted to engage ... an investment bank to assist in finding a buyer for Akustica. (Rangos' App. Ex. 82.)

Only three offers were submitted to acquire Akustica and ultimately the Board voted to approve the purchase of 100% of Akustica's stock by Robert Bosch North America ["Bosch"] for $13.5 million. The acquisition closed in the summer of 2009.

The various Rangos investors lost millions of dollars from their investments in Akustica; [Appellee] Meakem lost more than $2 million as a result of his investment, including the total loss of the value of his common shares. [Appellant] also lost his common shares; [Appellant's] stock was rendered worthless through the sale for $13.5 million.

Trial Court Opinion ("T.C.O."), 10/13/2011, at 1–11 (some footnotes omitted and typographical changes for clarity).

## II. PROCEDURAL HISTORY

On or about December 29, 2008, Appellant filed the complaint that underlies the instant litigation. Therein, he asserted counts against Appellees for (I) breach of fiduciary duty, (II) slander *per se,* (III) fraud, (IV) tortious interference with prospective business relations, and (V) civil conspiracy. Appellee Meakem filed an answer and new matter, while Appellee Rangos filed preliminary objections. Later, Appellee Meakem filed a motion for judgment on the pleadings. On June 30, 2009, the trial court sustained Appellee Rangos' preliminary objections as to counts II (slander *per se* ) and IV (tortious interference with prospective contractual relations). As to count V (civil conspiracy),

the court sustained Appellee Rangos' preliminary objection only to the extent that Appellant alleged that Appellee Rangos had participated in a scheme to prevent Appellant from continuing his employment with Akustica. The trial court also granted judgment on the pleadings to Appellee Meakem on the same two counts that it dismissed as to Appellee Rangos, and on the civil conspiracy claim in all regards except in connection with the remaining claims for breach of fiduciary duty. None of these dismissal rulings are at issue here.

Thereafter, the parties engaged in discovery, following the conclusion of which Appellees filed separate but materially similar motions for summary judgment. Therein, Appellees asserted challenges to Appellant's standing to pursue his claim directly (as opposed to derivatively, on behalf of the corporation). They also contended that Appellant had failed to establish a genuine issue of material fact regarding the breach of fiduciary claims that had survived Appellee Rangos' preliminary objections and Appellee Meakem's motion for judgment on the pleadings. On October 13, 2011, the trial court granted Appellees' motions for summary judgment and dismissed all of Appellants' claims against both Appellees. This appeal followed.[7]

Appellant identifies four issues in his statement of the questions involved. However, in violation of Pa.R.A.P. 2119(a), Appellant structures his argument not in four parts corresponding to his four stated issues but in seven parts that only approximately echo the four issues as stated, and which arguably assert errors neither stated nor fairly encompassed within Appel-

lant's statement of the questions presented, a violation of Pa.R.A.P. 2116(a) ("No question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby."). We choose not to find Appellant's issues regarding his claims for fiduciary duty waived, because nothing substantially impedes our ability to review Appellant's arguments. *See, e.g., Universal Underwriters Ins. Co. v. A. Richard Kacin, Inc.,* 916 A.2d 686 (Pa.Super.2007).

■ Conversely, Appellant's brief leaves us no choice but to find waived any intended argument regarding the trial court's dismissal of Appellant's count for fraud (count I), because Appellant fails to isolate and argue any such challenge. As well, because we affirm the trial court's dismissal of Appellant's breach of fiduciary duty claims, we need not address his civil conspiracy claim (count V). Under both Delaware and Pennsylvania law, that conspiracy claim will not lie without a valid underlying civil claim. *See Kuroda v. SPJS Holdings, L.L.C.,* 971 A.2d 872, 892 (Del.Ch.2009) ("Civil conspiracy is not an independent cause of action; it must be predicated on an underlying wrong."); *Goldstein v. Phillip Morris, Inc.,* 854 A.2d 585, 590 (Pa.Super.2004) ("[A]bsent a civil cause of action for a particular act, there can be no cause of action for civil conspiracy to commit that act.").

This leaves only Appellant's various challenges to the trial court's ruling regarding Appellant's breach of fiduciary duty claims. First, however, we address Appellee Rangos' claim that Appellant lacked standing to pursue these claims in

---

7. We have nothing of record indicating that the trial court directed Appellant to file a concise statement of the errors complained of on appeal pursuant to Pa.R.A.P. 1925(b) or that Appellant filed such a statement. In any event, the trial court's opinion in support of its grant of summary judgment addresses each of Appellant's assertions of error in connection with the dismissal of Appellants' claims as to both Appellees. Thus, we have what we require to address the merits of Appellant's issue.

the first instance. *See* Brief for Appellee Rangos at 30–41.

## III. DISCUSSION

### A. Standard of Review

We begin by noting the standard of review we apply to a trial court order granting summary judgment:

A reviewing court may disturb the order of the trial court only where it is established that the court committed an error of law or abused its discretion. *Capek v. Devito* [564 Pa. 267], 767 A.2d 1047, 1048, n. 1 (Pa.2001). As with all questions of law, our review is plenary. *Phillips v. A–Best Products Co.* [542 Pa. 124], 665 A.2d 1167, 1170 (Pa.1995).

In evaluating the trial court's decision to enter summary judgment, we focus on the legal standard articulated in the summary judgment rule. Pa.R.C.P. 1035.2. The rule states that where there is no genuine issue of material fact and the moving party is entitled to relief as a matter of law, summary judgment may be entered. Where the non-moving party bears the burden of proof on an issue, he may not merely rely on his pleadings or answers in order to survive summary judgment. "Failure of a non-moving party to adduce sufficient evidence on an issue essential to his case and on which it bears the burden of proof ... establishes the entitlement of the moving party to judgment as a matter of law." *Young v. PennDOT* [560 Pa. 373], 744 A.2d 1276, 1277 (Pa.2000). Lastly, we will view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. *Pennsylvania State Univ. v. County of Centre* [532 Pa. 142], 615 A.2d 303, 304 (Pa.1992).

*Murphy v. Duquesne Univ. of the Holy Ghost*, 565 Pa. 571, 777 A.2d 418, 429 (2001) (citations modified).

With regard to standing, however, our standard of review differs somewhat. As a question of law, a trial court's ruling regarding standing is subject to a *de novo* standard of review. Moreover, our plenary scope of review entitles us to examine the entire contents of the record. *In re Hickson*, 573 Pa. 127, 821 A.2d 1238, 1242 (2003).

Although Appellees challenged Appellant's standing to pursue a direct action in their motion for summary judgment, *see* Memorandum in Support of Alex W. Rangos' Motion for Summary Judgment, 1/10/2012, at 39–50; [Appellee Meakem's] Memorandum of Law in Support of Motion for Summary Judgment, 1/10/2012, at 23–34, we do not have the benefit of an express discussion by the trial court regarding the question. Nonetheless, the trial court's extensive analysis of the merits of Appellant's defenses against Appellees' motions for summary judgment enables us to infer that the court either bypassed or rejected Appellees' challenge to standing.

### B. Standing

Under Delaware law, which the parties do not dispute applies to this case, a party seeking direct (versus derivative) relief for improper dilution of his equity in a company must establish the presence of a "controlling shareholder." Only upon establishing that such a shareholder through his controlling status effectuated the equity dilution to his own benefit at the expense of the other shareholders may Appellant maintain a direct action. *See Gatz v. Ponsoldt*, 925 A.2d 1265, 1273 (Del. 2007). Absent satisfaction of that criterion, any such action must be pursued derivatively, *i.e.*, on behalf of the corporation and its owners, with any damages re-

dounding to the corporation, not to the shareholder who instituted suit derivatively.

■ In a case like this one, in which the nominal claimant alleges equity dilution or loss of voting power, the harm is treated as though it affected the corporation itself. The Delaware Supreme Court has described such a case as one in which the action in question improperly cost shareholders "a significant portion of the cash value and the voting power of their ... stock interest" in a transaction in which the corporation "overpa[id] for ... [a] benefit that it received in exchange." *Gentile v. Rossette*, 906 A.2d 91, 99 (Del. 2006). "[The derivative suit] enables a stockholder to bring suit on behalf of the corporation for harm done to the corporation. Because a derivative suit is being brought on behalf of the corporation, the recovery, if any, must go to the corporation." *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1036 (Del. 2004) (citations, internal quotation marks, and footnotes omitted).[8] Because a derivative action may be filed only by a shareholder on behalf of a corporation, Appellant may maintain his action derivatively only if he retains an equity stake in the corporation throughout the litigation. *Lewis v. Anderson*, 477 A.2d 1040, 1046 (Del.1984) (citing cases). Appellant does not dispute that he was divested of all shares in Akustica when that company was acquired by Bosch. Hence, to proceed here, Appellant must have standing to bring a **direct** action against Appellees.

Delaware law recognizes a "narrow escape hatch" pursuant to which a party may pursue an equity dilution claim directly.

See *Feldman v. Cutaia*, 956 A.2d 644, 655 (Del.Ch.2007). In *Feldman*, the Delaware Court of Chancery held that a direct action will lie when the following two criteria are satisfied:

(1) A stockholder **having majority or effective control caused the corporation** to issue "excessive" shares of its stock in exchange for assets of the controlling stockholder that have a lesser value; and

(2) The exchange caused an increase in the percentage of the outstanding shares owned by the controlling stockholder, and a corresponding decrease in the share percentage owned by the public (minority) shareholders.

*Id.* at 656 (quoting *Gentile*, 906 A.2d at 99–100) (modifications omitted; emphasis added).

■ In resolving this matter on summary judgment, we must view the pleadings and evidence in a light most favorable to Appellant. There is no question that Appellant has pleaded that Appellees were controlling shareholders who exercised effective control of the board. Indeed, this is the linchpin of his claim. Moreover, Appellant essentially argues that the $15 million pre-money valuation upon which Appellee Rangos' Term Sheet II was based was well below the correct valuation, and that the Term Sheet II investors, the Rangos family in particular, received more equity than they paid for at the expense of the other shareholders. Thus, Appellant has duly pleaded a direct action under the *Gentile* test.

---

8. The Delaware Court of Chancery and Supreme Court often relegate their citations to footnotes. For ease of reference, we have omitted such footnotes in the excerpts of Delaware cases provided herein. In keeping with our own approach to citation, such embedded citations either will be inserted in the given excerpt or noted in a parenthetical to our citation of the case quoted.

## C. The Existence of a Fiduciary Duty

Having determined that Appellant had standing to bring the instant claim, we now address Appellant's arguments that Appellees had a fiduciary duty to Appellant and breached that duty. Although Appellant could have made this distinction clearer, he asserts the breach by Appellees of two distinct species of fiduciary duty. First, Appellant challenges Appellees' conduct as board members who stood on both sides of the complained-of transaction. Second, Appellant asserts that Appellees, *qua* putatively controlling shareholders, breached the fiduciary duty that such controlling shareholders owe minority shareholders. We address these claims in turn.

### 1. Breach of Fiduciary Duty of Directors Standing on Both Sides of a Transaction

■ "All directors of Delaware corporations are fiduciaries of the corporations' stockholders." *eBay Domestic Holdings, Inc. v. Newmark,* 16 A.3d 1, 26 (Del.Ch. 2010); *see Unocal Corp. v. Mesa Petroleum Co.,* 493 A.2d 946, 955 (Del.1985) ("[C]orporate directors have a fiduciary duty to act in the best interests of a corporation's stockholders."). Appellant argues that the trial court erred in "ignor[ing] the prohibition against self-interested directors approving the unfair $15 million valuation of the Series C offering." Brief for Appellant at 41 (capitalization modified). He notes that, when a "majority of interested directors approve a transaction," Delaware's "entire fairness" test applies, an assertion he supports with the following passage from the Delaware Supreme Court's decision in *Weinberger v. UOP, Inc.,* 457 A.2d 701 (Del.1983):

When directors of a Delaware corporation are on both sides of a transaction, they are required to demonstrate their utmost good faith and the most scrupulous inherent fairness of the bargain. . . . [W]here one stands on both sides of a transaction, he has the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts.

*Id.* at 710 (citations omitted); *see* Brief for Appellant at 41–42.

Appellant argues that the trial court erred in "seem[ing] to find important that all of the Board Members voted to approve the $15 million [pre-money] valuation [for Term Sheet II] on September 11, 2008[,] as if this, somehow, could cure the majority [*sic*] self-interested approval of an unfair transaction." Brief for Appellant at 42 (emphasis in original). Appellant emphasizes that the trial court did not address the fairness of the transaction at all. *Id.*

■ Appellant fails to acknowledge that the "entire fairness" test does not apply unless and until he has come forward with sufficient evidence to rebut the default application of the business judgment rule, pursuant to which Delaware courts "will not second-guess ... [the board's] business judgments." *Cinerama, Inc. v. Technicolor, Inc.,* 663 A.2d 1156, 1162 (Del.1995) (quoting the related case of *Cede & Co. v. Technicolor, Inc.,* 634 A.2d 345, 361 (Del.1993)). Only upon such a showing will the burden shift to the director defendants to prove that the action challenged met the "entire fairness" test. *Id.* This burden-shifting approach applies as well in the context of derivative suits; the Delaware Supreme Court has held that "the plaintiff must allege with particularity facts raising a reasonable doubt that the corporate action being questioned was properly the product of business judgment." *Brehm v. Eisner,* 746 A.2d 244, 254–55 (Del.2000).

As well, Appellant omits to provide any discussion of section 144 of Delaware's corporate code, which specifically provides a safe harbor under certain circumstances for interested director transactions. That section provides, in relevant part:

§ 144. Interested directors; quorum

(a) No contract or transaction between a corporation and 1 or more of its directors or officers, or between a corporation and any other corporation, partnership, association, or other organization in which 1 or more of its directors or officers, are directors or officers, or have a financial interest, shall be void or voidable solely for this reason, or solely because the director or officer is present at or participates in the meeting of the board or committee which authorizes the contract or transaction, or solely because any such director's or officer's votes are counted for such purpose, if:

(1) The material facts as to the director's or officer's relationship or interest and as to the contract or transaction are disclosed or are known to the board of directors ..., and the board ... in good faith authorizes the contract or transaction by the affirmative votes of a majority of the disinterested directors, even though the disinterested directors be less than a quorum....

8 Del.C. § 144.

■ Appellant also insists repeatedly, as detailed below, that the board was not fully informed regarding Texas Instruments' ("TI") acquisition interest in Akustica, which first arose on or about June 20, 2008, when TI presented a proposal to purchase "substantially all of Akustica's assets for an initial offer of at least $80 Million." Complaint, 12/29/2008 ("Complaint"), at 11 ¶ 51. Appellant seeks to establish that Appellees failed to inform the board of TI's interest and, consequently, deprived the full board of the information necessary to assess the fairness of Term Sheet II, thus compromising the board's decision-making.

We find *Weinberger* and *Cinerama, supra,* distinguishable, which is unsurprising inasmuch as Appellant makes no effort to reconcile their facts and circumstances with those *sub judice.* *Weinberger* involved directors—who were serving as such to both the acquiring corporation and the subsidiary corporation to be acquired—who possessed a report with information relevant to the merger decision, and yet withheld that report from outside directors of the subsidiary to be purchased. 457 A.2d at 708–09. Specifically, the inside directors had an internal report at their disposal that indicated that the merger would be a good investment for the parent at a share price of up to $24, rather than the $21 tender recommended to the subsidiary's minority shareholders whose votes were essential to approval of the merger. *Id.* at 707. The report further indicated that paying the higher price to the subsidiary's shareholders would only minimally reduce the acquiring corporation's bottom line while netting millions of additional dollars for the subsidiary's shareholders. Specifically, the report suggested that the parent's return on investment at $21 would be 15.7% while it would be 15.5% at $24. A $24 tender, however, would provide an additional $17 million to the minority shareholders of the subsidiary. *Id.* at 709. The court summarized its conclusion that failing to divulge the report constituted a breach of fiduciary duty, as follows:

Certainly, [the report with the alternative valuation] was a matter of material significance to [the subsidiary] and its shareholders. Since the study was pre-

pared by two [subsidiary directors], using [the subsidiary's] information for the exclusive benefit of [the parent], and nothing whatever was done to disclose it to the outside [subsidiary directors] or the minority shareholders, a question of breach of fiduciary duty arises. This problem occurs because there were common [parent-subsidiary] directors participating, at least to some extent, in the [subsidiary] board's decision-making processes without full disclosure of the conflicts they faced.

*Id.*

Appellant's allegations regarding conflict and non-disclosure are neither so serious nor so substantiated as those at play in *Weinberger.* To the contrary, Appellant's allegations, as stated before this Court, are difficult to comprehend; in any event, those allegations completely sidestep the issue. The non-disclosure that Appellant alleges concerns Appellees' putative failure to inform the board of TI's undisputed interest in acquiring Akustica, and the attendant negotiations that occurred from June of 2008 until the fall, negotiations that undisputedly were conducted **by Appellant** and Dr. Gabriel from June until August. During this period, of course, Appellant and Dr. Gabriel also were board members, and it was as incumbent on them as on anyone else to inform the board regarding the negotiations. Indeed, the harder that Appellant presses the Appellees' obligation to inform the board, the more effectively he argues for his own and Dr. Gabriel's obligations to do the same. To their credit, according to Appellant's averments, Appellant and Dr. Gabriel did precisely that, not just in June but again on August 5, 2008, shortly before the Board's preliminary approval of Term Sheet II. Complaint at 11–12 ¶¶ 54 (Appel-

lant and Dr. Gabriel "presented [TI's] revised proposal to the Company Board on or about June 28, 2008"), 57 ("On August 5, 2008, ... [Appellant] and Gabriel "immediately communicated [TI's] preference for foregoing intermediate partnerships and proceeding directly to acquisition negotiations] to the Board members. ..."). These averments patently distinguish the circumstances of this case from those manifest in *Weinberger.*

Appellant's argument to the contrary disregards his own pleadings. The trial court expressly concluded that, "if the Board was not properly apprised of [TI's] interest in acquiring the company for an amount between $75 and $85 million, the fault lay with [Appellant] as CEO of the company and Dr. Gabriel (the other board member participating in the discussions). They were conducting the negotiations and had an obligation to furnish this information to the Board." T.C.O. at 19. Appellant rejects this judicial conclusion, and states as follows:

> The court ... state[s] that *Plaintiff's averments* that he presented to the Board information about TI's acquisition interest is [*sic* ] inconsistent with "plaintiff's claim that the Board was not properly advised of the interest of [TI] in acquiring Akustica."

> This is simply a misstatement of the facts of this case and a misunderstanding of the claims. Appellant will be absolutely clear here. Both Appellees knew about the acquisition interest from TI. It was with that knowledge that Appellees attempted to seize the company through a downround [9] [*i.e.,* Term Sheet II] (buy low) and then sell high to TI. ... Appellees *knew* about TI's acquisition interest prior to terminating Ap-

9. By this term, Appellant evidently means a round of investment based upon a valuation

lower than the valuation associated with a prior (or the most recent) financing round.

pellant and forcing the low value down-round. Appellees used their control over the remainder of the Board ... to vote for the low valuation downround. Brief for Appellant at 50 (emphasis in original). Appellant further contends that Appellees disingenuously have maintained in this litigation that they were unaware of the negotiations with TI.

Regardless of whether Appellees knew about the negotiations, or even knew and **attempted** to withhold that fact from the board, Appellant's own averments establish that any such effort was in vain. After all, Appellant himself had informed the board as early as June 28, 2008, and again on August 5, 2008, of TI's interest and the progress of the negotiations. While Appellees' efforts, if any, to withhold this information from the board standing alone might be improper (to the extent they believed the board was not already aware of the information in Appellees' possession), that does not change the fact that no harm could have come to a board through an alleged lack of critical information when that board, in its entirety, was given precisely the information in question **by Appellant.** The trial court did not err: It drew the obvious conclusion, precisely by taking Appellant's pleadings at face value. Thus, no claim may lie that is predicated upon any such assertions.

■ The same fate befalls Appellant's argument regarding the alleged conflicts of interest of all or a majority of the board members, independently of the infirm claim regarding the alleged failure to inform the board of TI's acquisition interest. In support of this aspect of his argument, Appellant appears to rely on *Cinerama,* but that case also is distinguishable. *Cinerama* concerned a derivative action brought by the plaintiff shareholder corporation, Cinerama, against Technicolor. The sale of Technicolor was to occur via a two-stage tender offer/merger transaction. Cinerama declined to tender its stock in the first stage of the transaction, then challenged the fairness of the stock price designated in the second round. 663 A.2d at 1159–60. The driving question in that case was related to the burden-shifting inquiry that applies in the context of the business judgment rule, and the application of the stringent "entire fairness" standard once a challenger has successfully rebutted the business judgment presumption. Appellant is correct that, absent other considerations, a decision made by conflicted directors must be evaluated under the "entire fairness" standard, just as stated in *Cinerama.* However, Appellant neglects to acknowledge—and *Cinerama* does not speak to—critical caveats to this general principle, in particular the qualification stated in section 144 of Delaware's corporate code, *supra,* regarding the approval of a majority of disinterested directors.

This is not to say that self-dealing by board members in any form is blessed by Delaware law. To the contrary, the "entire fairness" test stands for the contrary proposition. However, the utter lack of on-point authority offered by Appellant, as well as the superficiality of his argument against the proposition that a majority of disinterested board members blessed Term Sheet II with all necessary information at their disposal, makes it impossible for this Court to grant relief on this basis. Our rules require more robust argument. *See* Pa.R.A.P. 2119(a) (requiring such discussion and citation of authorities as are deemed pertinent); *Price v. Penna. Prop. & Cas. Ins. Guar. Ass'n,* 795 A.2d 407, 412 (Pa.Super.2002) (finding issue waived where appellants "fail[ed] to develop analysis supporting their argument or present authority demonstrating their right to relief").

Moreover, Appellant's argument is especially weak with regard to Appellee Meakem. It is undisputed that neither Appellee Meakem (individually) nor MBVC invested in the Series C transaction. Appellant attempts to argue that Appellee Meakem's interest lay in the decision of Appellee Rangos and Mr. McIntyre (Mobius) to repay MBVC's defaulted $1 million bridge loan ($500,000 each) to purge Akustica's balance sheet of the secured loan. Brief for Appellant at 65–67. However, the trial court aptly found that repayment of that loan was obligatory on the part of Akustica, and that the record showed that Akustica had the resources to repay the loan upon MBVC demand, as required by contract, independently of whether Term Sheet II was approved and closed. T.C.O. at 22 "Even if Akustica went into bankruptcy, [Appellee] Meakem would be paid because of his first lien on all personal property. Furthermore, the loan was already due [in September of 2008]."[10] In short, Appellant's lack of evidence or argument that Appellee Meakem was conflicted in this transaction at all not only warrants summary judgment as to that party on the claim for breach of a director's fiduciary duty, but it also effectively eliminates him as a player in any controlled shareholder argument, as set forth at greater length below.[11]

With regard to Appellee Rangos, Appellant has failed to establish (except by reliance on bald allegations and innuendo) that the nature of the relationship between Rangos and his own family, *qua* lead investor under Term Sheet II, was unknown to the other board members, even assuming that constituted a conflict. Thus, no failure to disclose any conflict of interest arises from Term Sheet II. Similarly, on the record before us, it appears that a majority of disinterested directors (indeed, all of those who participated) approved Term Sheet II with full information—including information pertaining to TI's acquisition interest—so as to trigger the business judgment presumption under section 144. Appellant's cursory contention that all of the directors also were conflicted lacks substance. Appellant has failed to "allege facts as to the interest and lack of independence of the *individual members*" of the board he contends are conflicted, with the exception of Appellee Rangos, and, perhaps, John Rangos, Jr. *See Orman v. Cullman*, 794 A.2d 5, 22 (Del.Ch. 2002) (emphasis in original). In this regard, Appellant's brief exemplifies the perils of not addressing potentially adverse on-point legal principles.

Under Pennsylvania procedural law,[12] to survive summary judgment, Appellant as the non-moving party may not fall back solely on the "mere allegations" of his pleadings. Pa.R.C.P. 1035.3(a). Rather, Appellant must establish "one or more is-

---

**10.** The loan came due on July 10, 2008. T.C.O. at 7.

**11.** The trial court also observed that the repayment of the loan was necessitated because Appellee Meakem refused on MBVC's behalf to convert the debt in question to equity under Term Sheet II. T.C.O. at 22–23. Appellee Meakem also sought to avoid conversion of an earlier loan to equity, but was unable to stop that from occurring because the prior loan was subject to such conversion by its terms. T.C.O. at 23. This is yet another consideration militating against the allegation that Appellee Meakem anticipated any special gain under Term Sheet II and conspired with Appellee Rangos and others to force Term Sheet II upon a compliant board.

**12.** *See Ferraro v. McCarthy–Pascuzzo*, 777 A.2d 1128, 1137 (Pa.Super.2001) ("Whenever Pennsylvania is the chosen forum state for a civil action, our state's procedural rules i.e. [*sic*] the Pennsylvania Rules of Civil Procedure govern, no matter what substantive law our courts must apply in resolving the underlying legal issues.").

sues of fact arising from evidence in the record controverting the evidence cited in support of the motion or from a challenge to the credibility of one or more witnesses testifying in support of the motion." Pa. R.C.P. 1035.3(a)(1); *see Marks v. Tasman*, 527 Pa. 132, 589 A.2d 205, 206 (1991) (decided under materially similar predecessor rule 1035(d)). Although Appellant provided the trial court with scores of exhibits, he directs this Court to nothing in the record to suggest that the conflicts alleged, which were disclosed fully to the non-interested board members as required by section 144 of Delaware's corporate code, so corrupted the approval of Term Sheet II that Appellant is entitled to relief.

For the foregoing reasons, we find that Appellant has failed to establish an actionable breach of fiduciary duty on the part of Appellees arising from their alleged conflicts of interest in connection with the board's unanimous approval of the Rangos' second Series C term sheet, or based upon the alleged withholding of critical information from other board members. Consequently, the trial did not err in granting summary judgment as to this facet of Appellant's claim for breach of fiduciary duty.

### 2. Breach of Fiduciary Duty of a "Controlling Shareholder"

 While "fairness" is the driving consideration *vis-à-vis* board members who stand on both sides of a given transaction, the duty of a controlling shareholder to other shareholders differs in some respects, although not in its essential fiduciary character. "[C]ontrolling shareholders are fiduciaries of their corporations' minor-ity stockholders." *eBay Domestic Holdings*, 16 A.3d at 26.

 It is a truism that Appellant can establish a jury question regarding the alleged breach of a fiduciary duty only if he first establishes a jury question that such a duty attaches to Appellees in the first instance. Under Delaware law, shareholders, as such, do not owe other shareholders a fiduciary duty as a matter of course:

> A shareholder does not owe a fiduciary duty to the company's other shareholders unless she is a "controlling shareholder." ... A shareholder is a "controlling" one if she owns more than 50% of the voting power in a corporation *or* if she "exercises control over the business and affairs of the corporation."

> \* \* \*

 **To survive defendants' motions to dismiss, plaintiff must allege domination and control by [a controlling shareholder] through *actual* control of corporate conduct.** Simply alleging that they had the *potential* ability to exercise control is not sufficient.... Plaintiff can survive the motion to dismiss by alleging actual control with regard to the particular transaction that is being challenged.

*Williamson v. Cox Comm'ns, Inc.*, CIV.A. 1663–N, 2006 WL 1586375, at *4 (Del.Ch. June 5, 2006) (unpublished) (italics in original; boldface added);[13] *see also Weinstein Enterp., Inc., v. Orloff*, 870 A.2d 499 (Del. 2005) ("[F]or purposes of imposing fiduciary obligations, the plaintiff must establish

---

**13.** Delaware court rules anticipate the citation of unpublished opinions. *See, e.g.,* Rules of the Court of Chancery of the State of Delaware 171(g)(h) (providing for citation of unpublished memoranda and requiring attachment of same to briefs citing such cases); Delaware Uniform Citation, Rules 10.3(a)-(b) (setting forth citation guidelines for unpublished decisions). We have identified no Delaware rule addressing the precedential effect of such cases, but inasmuch as we use this case only as persuasive authority, we need not resolve that question.

the actual exercise of control over the corporation's conduct by that otherwise minority stockholder." (emphasis omitted)).

Perhaps no stronger statement of this principle can be found than the following:

> A party alleging domination and control of the majority of a company's board of directors, and thus the company itself, bears the burden of proving such control by showing a lack of independence on the part of a majority of the directors. An independent director is one whose decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influence. A controlled director is not an independent director.
>
> Control over individual directors is established by facts demonstrating that through personal or other relationships the directors are beholden to the controlling person. If plaintiffs are unable to meet their burden, then the board's actions are governed by the business judgment standard of review.[14]

*Odyssey Partners, L.P. v. Fleming Companies, Inc.*, 735 A.2d 386, 407 (Del.Ch. 1999) (internal quotation marks and citations omitted). Thus, to survive summary judgment, Appellant must establish a fact question regarding whether either of the Appellees, alone or in concert, were "controlling shareholders" who **actually** dominated the board and dictated its action such that the board could not function independently.[15] Absent such a showing, the business judgment rule governs the board's decision-making. In this case, Appellant has made no effort to overcome the considerable deference to a board's actions that the presumption requires. Thus, to the extent that the presumption does apply, Appellant's arguments are inadequate to avoid summary judgment on this basis.

Appellant's efforts to establish that Appellee Rangos and Appellee Meakem, individually or together, constituted a controlling shareholder are scattered like buckshot across his brief rather than contained within one clearly bounded discussion, although Appellant does devote one identifiable section of the brief to this issue. *See* Brief for Appellant at 55–59. What we find consists as much of conjecture and unsourced insinuations as it does of assertions supported by the record upon which the trial court made its decision. Even when citations are offered in support of a given premise, the cited document or testimony often has been mischaracterized or decontextualized.[16]

14. The Delaware Supreme Court has explained the contours of the business judgment rule as follows:

> The business judgment rule is an acknowledgment of the managerial prerogatives of Delaware directors under [8 Del.C. § 141(a)]. It is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company. Absent an abuse of discretion, that judgment will be respected by the courts. The burden is on the party challenging the decision to establish facts rebutting the presumption.

*Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984) (citations omitted), *overruled on other* grounds, *Brehm v. Eisner*, 746 A.2d 244, 254 (Del.2000). "[B]usiness judgment rule director liability is predicated upon concepts of gross negligence." *Id.*

15. As a corollary burden, and as noted *supra*, Appellant must "allege facts as to the interest and lack of independence of the *individual members* of th[e] board"—in this case, ostensibly, because those board members' independence was compromised by the controlling shareholders. *Orman*, 794 A.2d at 22.

16. Our problems in this regard are exacerbated by the fact that Appellant insisted on entering into evidence only very brief and selective excerpts from relevant depositions.

Despite these impediments to review, we have attempted to distill Appellant's contentions regarding control into a few categories for analytic convenience, as enumerated below.

> a) *Appellee Rangos' and the Rangos Family's substantial minority stake in Akustica, alone or in tandem with some combination of Appellee Meakem's and/or Mobius' stake, further bolstered by Appellee Rangos' "blocking rights" under the operative Third Amended Stockholders Agreement and his appointment by the board as "lead outside director" to Akustica management, rendered Appellee Rangos a controlling shareholder with the power to compel the remaining board members to do his bidding.*

▉ Appellant contends that Appellee Rangos and the Rangos family, *qua* Major Investors, controlled the business and affairs of Akustica. In support of this claim, he avers that, after Appellant was terminated, Appellee Rangos, as board-designated "Lead Outside Director," "assumed control, on behalf of [Akustica], of the acquisition discussions with [TI] . . . , initiated a layoff of employees, put the Company up for sale and terminated Appellant as CEO . . . , and he demanded that the Company terminate Appellant before he would allow presentation of a new financing term sheet upon which the Company's survival had been made to depend." Brief for Appellant at 56. Appellant notes that, before the Series C financing closed, the Rangos family collectively "held more than 33% of the interests in Akustica," had blocking rights to bar further investment by, *e.g.*, other potential Series C investors, and had the right to appoint two of the seven board members. *Id.* at 56. "Using this leverage," Appellant maintains, "Appellee Rangos coordinated action among other investors, Board Members and officers to exercise control of Akustica." *Id.* He adds that Appellee Meakem, the Rangos family, and Mobius collectively owned 61.8% of the total shares and appointed four of seven directors. Thus, "[c]ontrol was clearly exercised by the Rangos Family and this group." *Id.* And yet, there is nothing "clear" about Appellant's claims.[17]

The principal difficulty with Appellant's averments is that the evidence he offers in support, such as it is, does not directly establish even the prospect of the truth of those averments, the *sine qua non* for creating a jury question sufficient to warrant presentation to a jury at trial. For example, in support of the claims associated with the lead outside director designation, Appellant cites the deposition of Appellee Meakem. At the cited page, however, there is nothing whatsoever to support any of the several variations on Appellant's claims regarding the termination of Appellant's employment, or concerning negotiations with TI. Brief for Appellant at 56 (citing Deposition of Glen T. Meakem at 257). It is incumbent on Appellant to direct us to the part of the record that bears out his contentions. Pa.R.A.P. 2119(c). He has failed to do so. We will not comb the record to cure this deficiency. *See, e.g., Irwin Union Nat. Bank & Trust Co. v. Famous,* 4 A.3d 1099, 1103 (Pa.Super.2010).

However, we do find modest support for Appellant's claims at page 267 of Appellee Meakem's deposition, a passage that Appellant does not cite. There, Appellee Meakem attested that he left some unspecified lunch meeting, occurring at some

---

17. Appellant's not infrequent attempt to fold Mr. McIntyre and Mobius into the alleged conspiracy leaves an open question as to why neither Mr. McIntyre nor his firm was named as a defendant to this action.

unspecified date (again, we encounter difficulty arising from Appellant's narrowly selective excerpting of deposition transcripts), with the **impression** that Appellee Rangos and John Rangos, Jr., would be "more comfortable, they would feel it was possible for them to put more money into the company" were Appellant terminated. Meakem Deposition at 267. That a prospective (re)investor expressed a strong preference that the termination of a CEO, who appeared to have misstated prior earnings, had run a company into a sizable deficit, and had recently been forced radically to revise revenue projections downward to reflect unremitting losses in the current year and prospective losses in the years to follow, hardly suggests that said investor was a "controlling shareholder," especially when the termination of Appellant's employment apparently was agreed to unanimously by all directors.

Appellant's reliance on the deposition testimony of Mr. Jacobson, who replaced Appellant as CEO, regarding Appellee Rangos' role in the TI negotiations is no more helpful. Appellant contends that Appellee Rangos "assumed control" of these negotiations. Yet Mr. Jacobson said nothing of the sort. Asked what the board's intention was in naming Appellee Rangos as lead outside director, Mr. Jacobson responded that Rangos would "[a]ssist in any negotiations that may be required and, ... in terms of kind of assisting from the transition standpoint, anything that I may

need." Deposition of Joseph Jacobson, 8/23/2010, at 540. He agreed that "the purpose of this designated director was to work with [him] in [his] transition process." *Id.* at 540–41. He added that, because he had never before served as a chief executive, he thought the board "all felt comfortable that if [he] had someone to go to help to advise [him], that it would be beneficial," based upon the fact that Appellee Rangos had relevant experience serving as CEO for an unrelated concern. *Id.* at 541. Regarding whether the board considered other candidates, Mr. Jacobson indicated that "the general consensus [of the board] was that [Appellee Rangos] made the most logical choice." *Id.* at 542. Simply put, nothing in Mr. Jacobson's testimony so much as hints that Appellee Rangos, wearing the lead outside director hat, "assumed control" of anything.[18]

The inadequacy of Appellant's proof is critical. As noted *supra*, the Delaware Chancery Court in *Williamson* made clear that the mere **capacity** for control is insufficient to survive a motion to dismiss in a case predicated on the alleged actions of a controlling shareholder. Plaintiff must provide sufficient evidence for a jury to conclude that Appellee Rangos exercised **"actual control** with regard to the particular transaction that is being challenged," here, the board's approval of Term Sheet II. The sum of the above assertions falls short of that standard.

**18.** Despite Appellant's failure to cite this in the relevant section of his argument, we note that Dr. Gabriel attested that, "[i]n response to the pressure from [Appellees and Meakem] ..., the Board directed that" "critical personnel be laid off." Affidavit of Kaigham L. Gabriel, S.M., Ph.D., 2/17/2011, at 8 ¶ 44. As well, he asserted that "[Appellee] Rangos insisted upon being the only non-management Board Member to engage in discussions with TI during an August 29, 2008 conference call[] and he otherwise asserted a leadership role in the internal coordination of [Akustica's] negotiations with TI." *Id.* at 11 ¶ 61. However, none of this establishes the claims Appellant makes about Appellee Rangos' assumption of control over the TI negotiations, or, more importantly, his domination of the board in that or any other connection. There is no indication that the board did not independently approve this approach, or prefer it for sound business reasons.

*b) Electronic messages by Mobius Board Appointee Ryan McIntyre and Appellee Meakem establish coordination with, or control by, Appellee Rangos or the Rangos family.*

 This argument is perhaps the most perplexing. Appellant takes slivers of email exchanges out of context (what he refers to as "some of the more shocking evidence" of Appellee Rangos' control over the board, Brief for Appellant at 57) in order to insinuate that Mr. McIntyre and Appellee Meakem—experienced and presumptively capable businessmen with considerable skin in the game—were so intimidated by the prospects of Rangos family reprisals should the directors fall out of line that they could not act independently.

Appellant cites an email between Akustica board member Ryan McIntyre and his associates in Mobius, in which Mr. McIntyre expressed his concern "that one outcome [of the Series C negotiations] may be [Mobius] breaking ranks with the Rangos Family." Mr. McIntyre worried that such a departure could result in the Rangos family "destroy[ing] the company and financing in a morass of litigation." Email, Ryan McIntyre to Jason Mendelson, *et al.,* 8/11/2008. Similarly, Appellant cites an email from Appellee Meakem to his MBVC partners, in which he offered, amongst a list of "positives and negatives on Akustica," the following "negative":

> The Rangos family has demonstrated that they just cannot move quickly or communicate consistently through the process to try to get this Series C financing closed in the weeks since our LP committee approved our investment. I am confident that [Appellant] will fight through this noise and deal will close over the next 2 to 4 weeks. However, the Rangos family's behavior this spring has given me a queasy feeling in the pit of my stomach. Will these guys act

quickly and non-emotionally enough to seize the opportunity to sell the company when the moment comes? I don't know? [*sic*] And, I am learning that I do not like situations where we are substantially NOT in control (or cannot trust the people who are in control).

Email, Glen Meakem to David Becker, *et al.,* 6/1/2008.

Taken in context, the comments manifest something closer to legitimate worry on the part of MBVC, Mobius, and/or their principals about the future of Akustica—which evidently had been foundering to some degree since well before the incidents occurred upon which this litigation is based—and the fate of their investment therein, than they do any suggestion that these investors acted other than based upon their own independent judgment in response to intimidation or coercion by Appellee Rangos. After all, the emailed concerns appear far more centered on the investors' difficulties even communicating with the Rangos family; were the Rangos family so titanic and heavy-handed, one would expect it to figure more prominently in the particular events and issues considered in those emails.

To be clear, we recognize that this does not exclude the possibility that inaction may be used just as coercively as action in this context. *Cf. Guttman v. Huang,* 823 A.2d 492, 503 (Del.Ch.2003) (assessing whether directors breached their fiduciary duty by failing to oversee the company's compliance with certain legal requirements). Moreover, we recognize that Appellant seeks to make this argument. Appellant's allegations to this effect are based on the proposition that the Rangos family deliberately delayed its due diligence under its Term Sheet I in an effort to render Akustica so desperate for working capital that it would be forced to accept a much lower valuation, allowing Appellees to capi-

talize on a future acquisition at a much higher price. *See, e.g.*, Brief for Appellant at 64–65. The problem is that, by Appellant's own pleadings, TI's interest was not communicated until June 20, 2008. The unfavorable audit of Akustica's finances, as well as the downward revision of Akustica's projected revenues for 2008 and beyond (from profitability to continued losses), both were shared with the board roughly simultaneously on or about May 30, 2008. T.C.O. at 7. Thus, Appellant provides no basis to conclude that the Rangos family delayed due diligence based upon any such offer; and, of course, the troubling results of the audit certainly might lead a prospective investor to reconsider the pre-money evaluation of the company upon which further investment would be based.

Regarding the allegedly dilatory pace at which the Rangos family conducted the due diligence associated with Term Sheet I, the trial court offered the following:

> Nothing in the February 25, 2008 Term Sheet [Term Sheet I] required the Rangos [f]amily to complete due diligence prior to preparation of an audit sheet. Initially, the due diligence was to be completed by May 20, 2008, this being the date on which the closing [of Term Sheet I] was to take place. [Appellant] granted the request of the Rangos [f]amily to extend the due diligence period.

T.C.O. at 16. The trial court found, and Appellant does not dispute, that the Rangos family at some time after the approval of their first Series C term sheet indicated that their due diligence would not be completed until they saw the pending financial audit, T.C.O. at 7, a position that seems to us perfectly reasonable. In light of Appellant's allowance of an extension for that due diligence, which he does not allege was coerced by the Rangos family based upon its dominant or controlling role relative to the board, he cannot now complain that it was conducted too slowly.

Perhaps more importantly still, Appellee Meakem's declamation regarding MBVC's lack of control undermines Appellant's claims to the effect that Appellees Rangos and Meakem were working in concert to extract value from Akustica at the expense of the (other) minority shareholders. If Appellee Meakem did not feel he was working in concert with Appellee Rangos, then it is illogical to fold Appellee Meakem's shares **or** his dedicated board seat into the supposed Rangos cabal.[19]

In short, Appellant's evidence in this connection fails to bridge the gap between his bald allegations and a jury question regarding control.

*c) No independent committee nor any disinterested, informed directors approved the downround.*

■■■ This claim focuses on the August 12, 2008 meeting, at which the board first approved Term Sheet II.[20] Appellant notes

---

**19.** Additional instances of such confusion pervade Appellant's brief. For example, in connection with the approval of the first Rangos series C term sheet over those offered by MBVC and Paladin term sheets, Appellant alleges that Appellee Meakem "voluntarily **joined** a group of controlling shareholders" in approving the Rangos term sheet. Brief for Appellant at 63 (emphasis added). Once again, Appellant cannot seem to decide whether Meakem was an integral part of a controlling shareholder group, was in *post*

*hoc* çollusion with same, or was a board member compromised by such a group's influence. Put simply, Meakem has no business in a breach of fiduciary claim associated with a controlling shareholder if he was not, in fact, a controlling shareholder. Appellant cannot seem to decide.

**20.** The trial court notes that, prior to the August 12, 2008 meeting to consider and approve Term Sheet II, Dr. Gabriel and Messrs. Jacobson (by then the new CEO) and Kuznik,

that the attendees of that meeting were Appellee Rangos, Ryan McIntyre (Mobius), Dr. Gabriel, Mr. Jacobson, John Rangos, Jr., "and possibly Mr. Kuznik." Brief for Appellant at 43. Appellant asserts, without citation to any record evidence, that "Appellee Rangos, John Rangos, [Jr.,] and Ryan McIntyre controlled the Board" as to consideration of Term Sheet II. *Id.* Appellant also contends that Dr. Gabriel "was pressured by the controlling board members and disagreed with the decision [to approve the Rangos term sheet], yet he was conflicted by the sales bonus agreement." *Id.* Appellant cites several items, including: an internal document from TI; Mr. McIntyre's email referenced above, in which he worried about consequences of breaking ranks with the Rangos family; and an excerpt of Dr. Gabriel's deposition that contains nothing clear regarding the sales agreement. Moreover, it again appears that Appellee Meakem had no role in the conspiracy supposedly afoot, calling into question his place in this litigation.

Interestingly, one of Appellant's citations in support of this claim impliedly **undermines** his theory of Rangos family control. The document at issue appears to be an August 8, 2008 internal Mobius document posted to a shared intranet page. Therein, Mr. McIntyre describes the Rangos' presentation of Term Sheet II to the company in its final form.

> Ken Gabriel instead began to try to negotiate the terms and claimed he has a term sheet with better terms from an outside investor, though he wouldn't divulge many details or who it was from, though I'm guessing it is Paladin, who had offered a contingent (on due [diligence]) term sheet several months ago, but then bowed out when the company

chose the inside round. [Akustica] is insolvent at this point (can make two more payrolls, but has $2.3m in outstanding payables to 3rd party foundries and other vendors . . .), but the fact that Akustica has gone off and solicited a new term sheet unbeknownst to the board and investors has really upset the Rangos family to the point that John mentioned marching over the [*sic*] U.S. Attorney's office and suing the company . . . .

"Small Microphones = Big Problems," Foundry Mobius Portfolio intranet page, 8/8/2012. Not only does this establish nothing regarding Dr. Gabriel's reason for joining the board in voting for Term Sheet II, but it again suggests that Appellee Rangos was not a "controlling shareholder." It is difficult to imagine why a controlling shareholder with the pull to dominate a corporate board would resort to litigation, or the threat thereof, to bring that board into line with his wishes.

Appellant's insistence that an independent committee was required to act properly also is unavailing. The absence of such a committee, itself, does not establish a given minority shareholder's or group's control. Appellant fails to cite a single legal precedent that supports his claims that only an independent committee could properly have ratified Term Sheet II. Accordingly, this argument in substance is waived.

*d) Appellees deterred other Series C investors from submitting proposals.*

 Appellant repeatedly claims that two potential Series C investors, Flybridge Venture Capital, and Paladin, were denied the opportunity to offer term sheets to compete with Rangos Term Sheets I and,

none of whom were interested in Term Sheet II except insofar as they were common shareholders (those whose interests allegedly were

diluted improperly under Term Sheet II), discussed Term Sheet II by teleconference. T.C.O. at 9.

later, II. Brief for Appellant at 46–50. Appellant cites the affidavit of Dr. Gabriel to the effect that Appellee Rangos was displeased with Dr. Gabriel's effort to cultivate other investors, that the Rangos family on several occasions refused to meet with representatives of such prospective investors, particularly in the summer of 2008, and that the Rangos family was unwilling to negotiate with one such investor in August 2008, despite that investor's submission of a preliminary proposal for a Series C term sheet.

Appellant relies more or less exclusively on the affidavits of David Aronoff, a general partner of Flybridge, and H. Lee Buchanan, a venture partner of Paladin. T.C.O. at 19–20. After reviewing those affidavits and the surrounding circumstances, the trial court rejected Appellant's arguments. The trial court noted that the one actual proposal submitted by Flybridge was a "straw-man proposal" proffered on August 11, 2008, one day before the board was to consider the far more detailed Term Sheet II proposal. T.C.O. at 20. The trial court also observed that neither Mr. Aronoff nor Mr. Buchanan "aver[red] that they did not proceed [with Series C proposals] because they were advised that the Rangos Family was unwilling to permit any outside party to lead the Series C financing round." T.C.O. at 21.

In this regard, the trial court accurately characterizes the affidavits in question. Once again, the issue is not the potential for control, even granting such *arguendo*. The question is whether a potentially controlling shareholder actually asserted such control in such a way as to compromise the board's decision-making. Appellant does not appear to dispute that the board members seated for the August 12 meeting, including Dr. Gabriel, Mr. Jacobson, and perhaps Mr. Kuznik, were aware of Paladin's "straw-man proposal." The directors, whether interested or disinterested, declined to pursue further negotiations with Paladin. The affidavits in question provide insufficient reason to conclude that the Rangos family, alone or with whichever of the other board members Appellant variously asserts were controlled or controlling, exercised actual control to prevent consideration of the Paladin proposal or actively blocked the submission of competing Series C proposals. This is insufficient to establish a jury question regarding Appellees' alleged control.

For the foregoing reasons, Appellant's claims of Rangos family control, both those few that are substantiated to some modest degree and those that lack any material support in the record, wither under scrutiny. The allegations, viewed individually and collectively, cannot propel Appellant's claims over the evidentiary threshold necessary to make out a *prima facie* case. Accordingly, Appellant's claims that Appellees are liable as controlling shareholders who diluted Appellant's equity in Akustica by extracting disproportionate benefits for themselves are unavailing.

## IV. CONCLUSION

As set forth above, Appellant's claims against Appellees hinge upon two distinct theories: breach of fiduciary duty of company directors, as such, which duty is inherent in membership on a corporate board; and breach of the fiduciary duty of a controlling shareholder, which duty only attaches upon the attainment of such status. Appellant's argument in the first connection is predicated on his assertion that a majority of board members had conflicts of interest, due to their involvement on both sides of the Series C transaction. However, Appellee Meakem simply did not stand on both sides of the transaction in question. Moreover, a majority of the disinterested directors (as found by the trial

court due to a lack of evidence to the contrary, despite Appellant's conclusory claims that all members were conflicted) voted for the complained-of transactions, in apparent satisfaction of 8 Del.C. § 144, thus triggering the protections of the business judgment rule, violation of which Appellant does not argue.

Appellant's argument on a controlling shareholder theory fails for the numerous reasons set forth above. Distilling our discussion to its essence, however, the biggest problem is Appellant's apparent lack of clarity regarding who was a member of the putative control conspiracy, when or by what mechanism actual control was exercised, and to what end and whose benefit. We cannot gainsay the tremendous volume of evidence Appellant has proffered. But we also cannot overlook Appellant's failure to direct us to specific instances of such evidence that support the necessary predicates to create a jury question on this point, nor can we overlook the fact that the limited citations to the record and of legal authority Appellant does provide simply do not support the propositions for which they are cited.

For all the foregoing reasons, we discern no error of law or abuse of discretion on the part of the trial court. Thus, we find no basis upon which to grant Appellant relief.

Order affirmed. Jurisdiction relinquished.

PLATT, J., concurs in the result.