2020 PA Super 250

| | | |
|---|---|---|
| PADMASHRI SAMPATHKUMAR, SRIKANTH RAGHUNATHAN, AND NGX, INC. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellants | : | |
| | : | |
| v. | : | |
| | : | No. 544 WDA 2019 |
| | : | |
| CHASE HOME FINANCE, LLC; PHELAN, HALLINAN & SCHMIEG; SAFEGUARD PROPERTIES, INC. A.K.A. SAFEGUARD PROPERTIES, LLC; AND MORTGAGE ELECTRONIC REGISTRATION SYSTEM, INC. | : | |

Appeal from the Judgment Entered April 9, 2019
In the Court of Common Pleas of Westmoreland County Civil Division at
No(s): No. 5978-2012

BEFORE: NICHOLS, J., MURRAY, J., and MUSMANNO, J.

OPINION BY NICHOLS, J.:                    FILED OCTOBER 19, 2020

Appellants Padmashri Sampathkumar, Srikanth Raghunathan, and NGX, Inc., appeal from the judgment in favor of Appellees Chase Home Finance, LLC (Chase), Phelan, Hallinan & Schmieg (PHS), Safeguard Properties, Inc., also known as Safeguard Properties, LLC (Safeguard), and Mortgage Electronic Registration System, Inc. (MERS), following a bifurcated jury and bench trial resolving multiple claims.[1]  On appeal, Appellants

_____

[1] As needed, we may reference the individual parties by their names.  We may also cite to the extensive reproduced record for the parties' convenience.

challenge the trial court's pretrial rulings and grant of partial summary judgment. We grant in part and deny in part the motions to quash filed by Chase and Safeguard, quash Appellants' appeals in part as set forth below, and affirm.

This civil case has a complex, lengthy factual background, which resulted in multiple lawsuits. We state the facts as presented by the trial court:

## BACKGROUND

This case concerns foreclosure proceedings involving a property located at 406 Lorenzo Lane, Irwin, PA 15642 (the "Residence"). On or around March 27, 2002, Sampathkumar purchased the residence, utilizing a mortgage obtained through Flagstar Bank, FSB. The property was refinanced through Flagstar Bank, FSB on March 5, 2003, and the loan was then purchased by Federal National Mortgage Association ("Fannie Mae"). The instant mortgage (the "Mortgage") was executed by Sampathkumar and her husband, Srikanth Raghunathan as "Borrowers;" the loan was evidenced by a promissory note (the "Note") which was executed by Sampathkumar only. Chase began servicing the Mortgage on behalf of Fannie Mae in September 2003.

The text of the Mortgage provides in Paragraph 9:

Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument...then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property... Securing the Property includes but is not limited to, entering the Property to make repairs, change locks,

replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off…

The Mortgage additionally provides in Paragraph 15 that "[t]he notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender…. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower." All payments were made timely by Sampathkumar between September 2003 and July 2007.

In September 2006, Sampathkumar pleaded guilty to a felony count of making false statements in connection with a loan application to a federally insured financial institution in a criminal action unrelated to the mortgage on the Residence. Her husband Raghunathan pleaded guilty to making a fraudulent representation in connection with a loan application to a federally insured financial institution. A judgment in restitution totaling approximately $10.7 million dollars was entered against Sampathkumar and Raghunathan. Around May 4, 2007, Sampathkumar and Raghunathan were sentenced to prison and taken into federal custody. In August 2007, a lien was placed against the Residence for over ten million dollars, based on the previously ordered restitution.

Upon Sampathkumar and Raghunathan's incarceration, keys to the Residence were given to Sampathkumar's sister, Lakshmi Karan. According to Sampathkumar at time of trial, arrangements were made for Sampathkumar's cousin's husband, Kris Alladi, to reside in the home and pay the mortgage and all utilities until Sampathkumar was released from prison. In his testimony, Alladi denied this, and stated that he agreed to pay the mortgage and utilities only if he was able to raise funding for a nanotechnology company that was seeking to purchase patents and applications from Sampathkumar and Raghunathan's nanotechnology company and plaintiff to this action, NGX, Inc. Alladi failed to obtain this funding and did not make any payments. In approximately August of 2007[,] Alladi left the Residence and it became unoccupied. No mortgage payments were made after Sampathkumar's last payment dated for July 2007. Alladi and Sampathkumar stopped communicating in September 2007. While residing in the

Residence, Midi did not open or read any mail addressed to Sampathkumar and Raghunathan, and he testified that he was not asked to do so.

As noted above, the Mortgage required that Sampathkumar notify the lender in the event that notice should be provided to an address other than the residence, and it required that she "promptly" provide the lender with a "substitute notice address." Sampathkumar did not do so at any time between her May 2007 incarceration and early 2008. In approximately February or March 2008 Sampathkumar changed her mailing address with the USPS when her sister Karan filed a notice with the USPS directing that all mail should be forwarded from the Residence to Karan's home in California. Sampathkumar still failed to provide Fannie Mae and/or Chase with a substitute notice address at this time.

## THE FORECLOSURE PROCEEDING

Chase began the foreclosure process after the Mortgage had been delinquent for sixty days. Chase sent an Act 91 Notice, dated October 2, 2007, to Sampathkumar at the Residence. The notice was returned as undeliverable and marked "Moved, left no forwarding address." A second notice, dated November 21, 2007, was sent to the Residence and similarly returned as undeliverable and marked "Moved, left no forwarding address." On December 11, 2007, a Complaint in Mortgage Foreclosure was filed against Sampathkumar and the United States of America in the Westmoreland County Court of Common Pleas at Civil Case Number 10708 of 2007. Chase utilized the services of the law firm of Phelan, Hallinan and Schmieg ("PHS") in pursuing the foreclosure action. The Sheriff's Office of Westmoreland County made three unsuccessful attempts to serve the complaint on Sampathkumar at the Residence.

PHS filed a Motion for Service Pursuant to Special Order on February 18, 2008, and on March 4, 2008 the Honorable Daniel J. Ackerman granted the motion. The Motion outlined the efforts put forth to locate Sampathkumar and included an "Affidavit of Good Faith Investigation." The Order allowed for service on Sampathkumar by first class mail and certified mail sent to the Residence. On March 7, 2008, PHS sent the complaint by regular and certified mail to Sampathkumar at the Residence. Chase's internal records showed service "completed" on March 7,

2008; Chase was not aware at this time that Sampathkumar was residing in federal prison.

As Sampathkumar's mail began being forwarded to Karan in California in March 2008, the Complaint was delivered to and signed for at Karan's residence. Karan testified that she chose not to read Sampathkumar's legal mailings; instead she sent "what [she] thought were important legal documents" to Alladi, who was then residing at his home in Phoenixville, Pennsylvania. Alladi testified that he collected this mail without opening or reading it. Although Karan maintained twice monthly phone contact with both Sampathkumar and Raghunathan, she testified that neither mentioned that Alladi was no longer communicating with them.

Twenty one (21) days after the mailing of the Complaint, PHS sent a notice of default addressed to Sampathkumar at the Residence, providing for ten days in which to respond to the Complaint. Sampathkumar did not file a response to the Complaint, and on April 15, 2008, PHS entered a default judgment with the Westmoreland County Prothonotary, eighteen days after the notice of default was sent. PHS filed a writ of execution, and a Sheriff's Sale was scheduled for September of 2008. Sampathkumar was later successful in getting the Sale continued to November 2008.

After the entry of the default judgment in June 2008, Chase utilized a contractor, Mortgage Contracting Services ("MCS"), to determine that the Residence was vacant. On June 10, 2008, Chase issued a work order to MCS to change one lock on the Residence for the purpose of allowing Chase to maintain the property, pursuant to Paragraph 9 of the Mortgage. On June 16, 2008, the rear door lock on the Residence was changed; the main entrance door lock as well as the garage door opener remained unchanged. On June 16, 2008, MCS photographed the interior of the Residence and its contents. Neither MCS nor Chase ever removed any items from the property.

No evidence was presented to suggest that Chase told Sampathkumar, Raghunathan or any of their family and/or friends that they were not allowed full access to the residence for the removal of personal property. Alladi testified that he retained the garage door opener for the Residence as well as a key to the front door. Karan also retained a key to the front

door since May of 2007. The changing of the rear lock did not affect Sampathkumar's family and friends from being able to access and enter the residence at any point from the time of Sampathkumar's incarceration up to the Sheriff's sale, which occurred in November 2008. No testimony was presented by any witness that they were denied access to the residence.

## REMOVAL OF ITEMS FROM THE RESIDENCE

Throughout their incarceration, Sampathkumar and Raghunathan regularly communicated via phone and mail correspondence with family and friends including Karan, Alladi and their friend and attorney, John Bumbaugh. Sampathkumar was additionally allowed email access at some point in 2008. Sampathkumar testified that she became aware of the default judgment and Sheriff's Sale scheduled for September 2008 in approximately July of 2008 from both Karan and Raghunathan. Despite learning of the default, Sampathkumar did not make any attempt to bring the mortgage current or arrange for a payment plan with Chase, and she made no attempts to arrange for a sale of the property.

Bumbaugh testified that he regularly communicated with Raghunathan, and that he warned Sampathkumar and Raghunathan that they could lose their personal property located in the Residence after the Sheriff's Sale. Sampathkumar testified that at this point she intended to remove "everything" from the residence. Sampathkumar and Raghunathan enlisted the help of their friends and family, including Alladi, Karan, Bumbaugh and others to remove their personal property. Sampathkumar testified that she instructed Karan to "go to the house, see what was going on. Basically just pack everything and move everything into storage until we figured out what was going on." This did not happen, however. At trial, Sampathkumar admitted that had her friends and family followed this directive, that this litigation would not have occurred.

Regarding friends and family's actual efforts to remov[e] Sampathkumar and Raghunathan's personalty, Raghunathan initially asked Bumbaugh and Karan to remove the property and store it. Raghunathan also enlisted the help of friends Michael Banda and Tim Penatzer. One of these individuals contacted Chase to access the Residence, and on August 12, 2008, Chase

- 6 -

"placed a meet and greet work order" to allow the individuals to remove the personal property. Bumbaugh, Alladi, Pentazer, Banda and Karan entered the residence on August 16, 2008 to remove items. In addition to the front door key held by Karan, Bumbaugh obtained a rear door key from MCS, which he retained for "a couple weeks" before returning. Items were removed through the front and garage doors over a period of hours. Karan and Bumbaugh both testified that they were free to enter and remove items without any interference from Chase. During the removal, Sampathkumar spoke to Karan on the phone to provide her with additional instructions.

Karan testified that she removed some of Sampathkumar's jewelry, including her wedding jewelry, which Sampathkumar denied. Banda testified that he and Pentazer packed and removed enough boxes that they entirely filled up Banda's dump truck. No individual prepared an inventory of what was removed and what was left at the residence, and Sampathkumar testified that she never requested the same. Banda and Karan both testified that they were willing to return at any time to remove more items, but that they were not asked to do so. The boxes and items removed that day were taken and stored at Bumbaugh's law office, and Sampathkumar was made aware of the same in Fall 2008 prior to the Sheriffs Sale.

At trial, Karan testified that she intended to stay in Pennsylvania to remove and store the entire contents of the residence, however she stayed for only one day, based upon Bumbaugh's representation to her that he would move all the items into storage. She did not follow up on this assurance. Karan testified that after returning home to California, she informed Sampathkumar that she did not remove everything, and that Bumbaugh would finish moving everything to storage. Sampathkumar did not confirm this with Bumbaugh. Bumbaugh denied making any such representation to Karan.

Subsequent to the August 16, 2008 removal, Bumbaugh held an estate sale at the residence over two weekends, wherein members of the public were able to enter the Residence and purchase any remaining property from Bumbaugh. He also sold more of Sampathkumar and Raghunathan's property on other occasions. He created a partial inventory of the items sold. Bumbaugh testified that he told Raghunathan "and/or" Karan that he intended to sell the property. Sampathkumar testified

that she did not authorize him to sell any of the property, however she found out from Raghunathan prior to the Sheriffs Sale in November 2008 that he had done so, and that some property remained in the residence. Despite this knowledge, neither she nor Raghunathan asked any of the above individuals to return to the Residence and remove the remainder of their property. No person requested access to the property from Chase between the August 16th removal and the November 2008 Sheriff's Sale.

<u>COURT FILINGS AND CORRESPONDENCE</u>

In August 2008, Raghunathan requested that Bumbaugh prepare in forma pauperis motions for Raghunathan and Sampathkumar in the foreclosure action, and expressed his desire to "tie these people up in Court." Raghunathan sent a letter dated August 18, 2008 to Chase's foreclosure counsel requesting a postponement of September 2008 Sheriff's Sale and requesting information about the Mortgage. He also falsely stated in the letter that Bumbaugh was Sampathkumar's counsel in the matter. On August 21, 2008, Fannie Mae did postpone the Sheriff's sale until November of 2008. PHS via Attorney Judith Romano sent a letter to Raghunathan dated August 28, 2008 (copied to Bumbaugh as counsel for Sampathkumar) notifying him of the postponement of the Sheriffs sale and including details about the Mortgage and foreclosure action, which included the current amount owing. Raghunathan provided these documents to Sampathkumar. Bumbaugh and Raghunathan continued to correspond regarding the situation, and Raghunathan expressed his desire to "gain something from this unfortunate situation" through litigation, although he declined to express his strategy "in writing on the 'open' channels."

On September 8, 2008, Raghunathan again wrote to PHS (copying Bumbaugh as Sampathkumar's counsel) requesting copies of court filings and the Mortgage Note. On September 18, 2008, Romano responded, stating that she could not send any "future communications" to Raghunathan or Sampathkumar, as she believed that Sampathkumar had counsel. Romano continued sending correspondence to Bumbaugh. Bumbaugh never entered his appearance in the Foreclosure Action, despite the fact that he was held out by Raghunathan to be Sampathkumar's attorney in that matter. Sampathkumar testified to having a "dialogue" with Romano based on the

- 8 -

August 18, 2008 and September 8, 2008 letters addressed to Raghunathan and copied to Bumbaugh.

Sampathkumar stated that Chase through their counsel were "ignoring [her] letters" despite the clear statement in the September 8, 2008 letter that PHS and Chase would only communicate with Bumbaugh, based on Raghunathan's repeated assertion that he was Sampathkumar's counsel. Sampathkumar additionally testified that at no point did she herself attempt to reach out to Chase via phone or mail, despite the fact that she was unrepresented, and that she did not, in fact, write any letters. Raghunathan continued to attempt to communicate with PHS on Sampathkumar's behalf, including in his correspondence a power of attorney that was not properly notified [sic]. At no time did Sampathkumar personally authorize Raghunathan to speak to Chase on her behalf, per Chase's normal procedure. Sampathkumar testified that she wished to request a six-month stay on the Sheriff's Sale, in order to "bring the mortgage current." She did not explain how she intended to do so. This assertion is cast into further doubt based on the in forma pauperis motions filed by Sampathkumar and Raghunathan asserting a combined income of sixty five dollars per month; the motions failed to disclose any valuable assets held by the couple, including the approximately $600,000.00 of personal property which forms the basis of Sampathkumar's claim here, and which would have been present either in the Residence or the custody of friends and family at that time.

## SHERIFF'S SALE

The Residence was sold at Sheriff's Sale on November 10, 2008, with the successful bid being made by Chase on behalf of Fannie Mae. After the Sheriff's sale, Chase ceased servicing the loan and all decisions regarding the property were subsequently made by Fannie Mae. In December 2008, Fannie Mae contracted with Safeguard to secure the Residence and remove remaining property inside the residence. On December 18, 2008, Safeguard's contractor, Grynkewicz Contracting, Inc. performed a cleanout of the property. All locks to the residence were changed. None of this subsequent work was done by Chase or on Chase's behalf.

On November 12, 2008, Sampathkumar and Raghunathan filed a motion to open the default judgment and set aside the Sheriff's

Sale. The motion to set aside the Sheriff's Sale was deemed moot by the Court, and the motion to open judgment was stayed as the motion was filed by a person who was not a barred attorney (Raghunathan) on behalf of Sampathkumar. Sampathkumar mistakenly believed that this stay provided her with additional time to investigate and attempt to remedy the situation, however this belief was not formed in any way by any representation or action by Chase.

On October 2, 2012, this action was filed by Sampathkumar, Raghunathan and NGX against Chase and others. The present complaint initially sought over thirty million dollars in damages, of which only approximately $600,000 in personalty is presently in dispute, based on the claim at bar. Up to this point, Chase had no knowledge that personal property remained in the Residence after Sampathkumar's friends and family had accessed the Residence numerous times in order to remove and/or set the property. In order to investigate the claims in the present complaint, Chase voluntarily vacated the default judgment without prejudice and set aside the Sheriff's Sale on November 12, 2012. Subsequently, Fannie Mae transferred the Mortgage back to Chase for servicing and property preservation. Chase did not enter the residence at any point between October 2008 when MCS winterized the residence and November 30, 2012, when Fannie Mae transferred back the Mortgage.

After vacating the judgment, Chase attempted to tender the residence back to Sampathkumar, sending a letter dated January 23, 2014 to her then-attorney Herbert Terrell upon a demand for possession. Sampathkumar failed to respond to this tender. A second attempt was made by letter dated April 7, 2014, along with a request by Chase for Sampathkumar to make current the mortgage payments. Sampathkumar also failed to respond to this letter. In July 2015, Sampathkumar through Terrell again requested the keys to the residence, to which Chase responded that it would "engage in further discussions about the transfer" if Sampathkumar was "interested in reinstating the loan" and bringing it current. Sampathkumar testified at trial that this was an "unreasonable" demand.

## CLAIMED DAMAGES and LOSSES

Sampathkumar was released from prison in or around August of 2010. She moved into the Phoenixville, Pennsylvania home of

her cousin and her cousin's husband, Alladi. Sampathkumar and Alladi visited Bumbaugh's office in Fall 2010, however Sampathkumar did not inspect the contents of the boxes. She testified that there were "probably twenty" medium boxes stored in the office. Raghunathan, however, testified at trial that the boxes were much more numerous, and they stacked from floor to ceiling in the office. Sampathkumar stated that she finally removed the boxes and inspected their contents in February 2011. She never created an inventory of the same, but testified that nothing on her list of lost personal property was contained therein.

In the present litigation, Sampathkumar claims that $96,070.87.00 in jewelry was lost, including wedding jewelry and heirloom[s], despite Karan testifying that she removed at least some of this wedding jewelry. Bumbaugh testified to seeing empty jewelry boxes, and he stated that he believed that Karan had removed all of Sampathkumar's jewelry. Sampathkumar claims an additional $494,895.00 in miscellaneous personal property. Sampathkumar also claims $312,500.00 in lost rent, $2,030.88 in late charges, $19,160.00 in rent paid during the pendency of litigation, $2,000.00 in property storage fees, $2,500.00 as cost to retain counsel in the foreclosure matter, and an unknown amount of damages due to alleged property damage at the Residence. She additionally requests treble damages pursuant to the UTPCPL. At trial, evidence was presented consisting of photographs taken by MCS prior to the August 2008 property removal, photographs taken by Watson realty after the Sheriffs sale, and photographs taken by Fannie Mae's contractors during the cleanout of the Residence. These photographs support Chase's assertion that all valuable property was removed by Sampathkumar's friends and family. Throughout all of her testimony, Sampathkumar was unable to identify which items were taken, when they were taken, by whom they were taken, and what remained in the residence versus what was contained in the boxes retained by Bumbaugh and what was retained by Karan.

Sampathkumar admitted at trial that she did not know what remained in the home at the time of the November 2008 Sheriffs sale. She claims [that] she based her inventory and valuation in the present action based on her memory as of October 2012. She conceded that her valuation "obviously can't be accurate." as her receipts remained in the Residence. She did not adjust

for depreciation, and did not have any appraisals or other professional valuations for any of the allegedly lost items. The [c]ourt finds that Sampathkumar failed to sufficiently testify to the fair market value of the allegedly lost items. Sampathkumar additionally claimed losses in the form of damage to the residence, however she has not presently incurred any costs to repair the same, and did not offer any estimates of the work required to do so.

Trial Ct. Op., 12/20/18, at 1-14 (formatting altered).

As noted above, on October 2, 2012, Appellants filed suit, and on January 23, 2013, they filed their second amended complaint. Specifically, Appellants raised the following claims: (1) trespass, conversion, replevin, conspiracy, and unfair and deceptive trade practices (UTPCPL) against all Appellees; and (2) breach of a fiduciary duty and wrongful use of civil proceedings against Chase, MERS, and PHS only. R.R. at 205a.

In 2014 and 2015, Appellants hired and fired several counsel. Appellants' replacement counsel filed at least two motions to extend the discovery deadlines, which the trial court denied. Subsequently, Appellees filed motions for summary judgment, which the trial court granted in part and denied in part. Briefly, the trial court granted summary judgment in favor of some or all of the Appellees on all claims except conversion and UTPCPL.

Prior to trial, the parties filed several motions, which the trial court denied on August 9, 10, and 16, 2018.[2] The parties proceeded to a jury trial for Appellants' conversion claims against Safeguard and Chase, and a bench trial for Appellants' UTPCPL claim against Chase. Appellants timely moved for a directed verdict before the trial court charged the jury. Id. at 514b. On September 20, 2018, the jury found in favor of Chase and Safeguard on the conversion claim. Id. at 2125a. Appellants did not immediately file a post-trial motion from the jury verdict. The trial court then received testimony regarding the UTPCPL claim against Chase.

On October 30, 2018, Safeguard praeciped for entry of judgment. Appellants filed a motion to strike judgment, which the trial court granted on December 7, 2018, because "a final decision has [not] been entered in the remaining non-jury portion of this matter." Order, 12/7/18. On December 19, 2018, the trial court issued a decision in favor of Chase on the UTPCPL claim. R.R. at 2133a.

Raghunathan and NGX did not file a post-trial motion from the trial court's decision. On December 31, 2019, Sampathkumar filed a post-trial motion, which challenged the trial court's decision regarding the UTPCPL

_____

[2] We discuss these August 2018 orders in further detail below in resolving Safeguard's and Chase's applications to quash.

claim. Id. at 2169a. On March 12, 2019, the trial court denied Sampathkumar's post-trial motion. Id. at 2186a.

On March 19, 2019, Chase praeciped for entry of judgment, and on April 9, 2019, Appellants also praeciped for entry of judgment. Appellants filed a notice of appeal on April 10, 2019.[3] The trial court did not order Appellants to comply with Pa.R.A.P. 1925(b), but nevertheless filed a Rule 1925(a) opinion and supplemental opinion. Subsequently, Safeguard and Chase each filed in this Court a motion to quash Appellants' appeal, which we discuss below.[4]

<u>Safeguard's and Chase's Applications to Quash</u>

On June 21, 2019, Safeguard filed an application to quash Appellants' appeal in this Court. Safeguard noted that the jury returned a verdict in favor of Safeguard and Chase on Appellants' conversion claim. Safeguard's Appl. to Quash, 6/21/19, at 1 (unpaginated). Safeguard argues that because Appellants failed to file a post-trial motion following the jury trial on the conversion claim, "they have failed to preserve any issues related to the

_____

[3] Chase filed a cross-appeal on April 24, 2019, and Safeguard filed a cross-appeal on April 25, 2019, but they subsequently discontinued their cross-appeals.

[4] As noted above, only Sampathkumar filed a post-trial motion after the trial court ruled on Appellants' UTPCPL claim after a bench trial.

verdict." Id. at 2 (unpaginated).[5] Relatedly, Safeguard contends that Appellants failed to preserve their challenge to the trial court's August 2018 orders. Id. at 3 (unpaginated). On July 2, 2019, Chase filed a motion to join Safeguard's application to quash in addition to its separate application to quash Appellant's appeal. Chase's Joinder to Appl. to Quash & Separate Appl. to Quash, 7/2/19.

Appellants filed separate oppositions to each motion to quash raising similar arguments. Appellants contend that the trial was not complete until December 19, 2018, when the trial court issued its decision on their UTPCPL claim. See, e.g., Appellants' Reply to Safeguard's Mot. to Quash, 7/8/19, at 3 (unpaginated). With respect to the trial court's August 2018 orders, Appellants argue they were not required to raise their objections to those pretrial orders in a post-trial motion. Id. at 4.

Pennsylvania Rule of Appellate Procedure 341 states as follows:

(a) General Rule.— . . . an appeal may be taken as of right from any final order of a . . . trial court.

(b) Definition of Final Order.—A final order is any order that:

(1) disposes of all claims and of all parties; or . . .

_____

[5] Safeguard acknowledges that Sampathkumar filed a post-trial motion following the subsequent bench trial on the UTPCPL claim. Safeguard's Appl. to Quash at 1-2 (unpaginated). We add that Safeguard mistakenly asserted that all Appellants, including Sampathkumar, filed a post-trial motion. See id.

(3) is entered as a final order pursuant to paragraph (c) of this rule.

(c) Determination of finality.—When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the trial court or other government unit may enter a final order as to one or more but fewer than all of the claims and parties only upon an express determination that an immediate appeal would facilitate resolution of the entire case. Such an order becomes appealable when entered. In the absence of such a determination and entry of a final order, any order or other form of decision that adjudicates fewer than all the claims and parties shall not constitute a final order. . . .

Pa.R.A.P. 341.

With respect to when a post-trial motion must be filed, we discuss *Stevenson v. Gen. Motors Corp.*, 521 A.2d 413 (Pa. 1987), in which the trial court bifurcated the trial "into liability and damage portions." *Stevenson*, 521 A.2d at 414. One jury held the defendants liable and a different jury awarded damages. *Id.* The defendants filed post-trial motions at the conclusion of the liability and the damages portions. *Id.* at 414-15. The trial court granted the defendants' post-trial motion and awarded a new trial on both liability and damages. *Id.* at 415. This Court affirmed, and our Supreme Court granted allowance of appeal, framing the issue as whether "the trial court may upset a finding of liability in a bifurcated trial based upon evidence adduced at the damage phase of the case." *Id.*

In resolving the issue, the *Stevenson* Court first addressed "whether the jury's finding of liability assumes the characteristics of a verdict on which

judgment can be finally entered, subject to post-trial motions and appeal." Id. (emphasis added). Our Supreme Court ultimately concluded that a "jury's finding of liability in a bifurcated trial is not a finding on which a final judgment can be entered." Id. at 416. "Allowing the litigants to file post-trial motions and require their final resolution at the end of the first phase of a bifurcated trial would foster needless piecemeal determinations." Id.

Relatedly, with respect to issue preservation in a timely-filed post-trial motion, Pennsylvania Rule of Civil Procedure 227.1 provides as follows:

> (b) Except as otherwise provided by Pa.R.E. 103(a), post-trial relief may not be granted unless the grounds therefor,
>
> (1) if then available, were raised in pre-trial proceedings or by motion, objection, point for charge, request for findings of fact or conclusions of law, offer of proof or other appropriate method at trial; and
>
> > Note: If no objection is made, error which could have been corrected in pre-trial proceedings or during trial by timely objection may not constitute a ground for post-trial relief. . . .
>
> (2) are specified in the motion. The motion shall state how the grounds were asserted in pre-trial proceedings or at trial. Grounds not specified are deemed waived unless leave is granted upon cause shown to specify additional grounds.

Pa.R.C.P. 227.1(b)(1)-(2).

Therefore, "in order to preserve pretrial rulings on appeal from a final determination, the rulings must be raised in post-trial motions." Dauphin Deposit Bank & Trust Co. v. Pifer, 556 A.2d 904, 907 (Pa. Super. 1989) (citing Pa.R.C.P. 227.1(b)); see also Hinkson v. Com., Dep't of Transp., 871 A.2d 301, 303 (Pa. Cmwlth. 2005) (stating, "[t]he requirement that

the motion state how the grounds were raised at trial indicates compliance with the requirements of Dilliplaine v. Lehigh Valley Trust Co., 457 Pa. 255, 322 A.2d 114 (1974), and subdivision (b)(1) that there be a timely objection in pre-trial proceedings or at trial. Thus, the failure to specify in a post-trial motion how the grounds for relief were asserted at trial, or in pre-trial proceedings, will result in a waiver of those grounds." (emphasis in original) (citation and alterations omitted)). However, "it is unnecessary to include a prior order granting summary judgment in post-trial motions for purposes of issue preservation." B.K. ex rel. S.K. v. Chambersburg Hosp., 834 A.2d 1178, 1181 (Pa. Super. 2003) (citation omitted).

Here, we acknowledge that the instant trial was not bifurcated into liability and damages phases. The trial below, however, was divided into jury and non-jury phases. Applying the reasoning of our Supreme Court, we agree that obligating Appellants to file a post-trial motion at the end of the jury trial before commencing a non-jury trial would "foster needless piecemeal determinations." Cf. Stevenson, 521 A.2d at 414. Moreover, as noted above, the trial court granted Appellants' motion to strike the judgment because a final decision had not yet been entered. Order, 12/7/18. Appellants did not have to file a post-trial motion following the jury trial but did have to file a post-trial motion following the subsequent bench trial. Cf. Stevenson, 521 A.2d at 416.

Raghunathan and NGX, however, did not file a post-trial motion following the bench trial, and therefore did not preserve their challenges to the trial court's August 2018 orders. See Pifer, 556 A.2d at 907. Although Sampathkumar filed a post-trial motion following the bench trial, the motion challenged only the UTPCPL verdict and not the trial court's August 2018 orders. Therefore, we grant in part the motions to quash.

Specifically, we quash Raghunathan and NGX's appeal to the extent they attempted to challenge the trial court's August 2018 orders. We deny in part the motions to quash to the extent Chase and Safeguard requested we quash Sampathkumar's appeal on the basis that Sampathkumar should have filed a post-trial motion following the earlier jury trial. However, although Sampathkumar filed a post-trial motion following the bench trial, she waived any challenge to the trial court's August 2018 orders because she did not properly preserve them in her post-trial motion. See id.; see also Pa.R.C.P. 227.1(b)(1)-(2). Therefore, we also quash in part Sampathkumar's appeal to the extent she also attempted to challenge the trial court's August 2018 orders. Regardless, even if Appellants had properly preserved their claims regarding the August 2018 orders, they lack merit for the reasons we state below.[6]

_____

[6] In their appellate briefs, Appellants challenge only the trial court's August 9, 2018 order, which denied their second motion for reconsideration of the order granting Appellees' pretrial motion to strike Appellants' expert reports. (Footnote Continued Next Page)

<u>Appellants' Issues</u>

Appellants raise the following issues:

1. Did the trial court commit an abuse of discretion when it denied [Appellants'] several motions to modify the October 9, 2014 Case Management Order when the underlying proceedings involved the analysis of five prior years of foreclosure proceedings, when [Appellees'] actions substantially contributed to the case's lack of progress, when [Appellants] and their attorneys severed ties as deadlines were drawing near, and when [Appellees] would have suffered no prejudice?

2. Was it an abuse of discretion for the court to strike [Appellants'] proffered experts when the case had not yet been scheduled for trial, and when any alleged prejudice would have been cured by an extension of time for [Appellees] to obtain rebuttal testimony.

3. Was it error for the court to dismiss [Appellants'] Trespass and Breach of Fiduciary Duty claims at summary judgment based upon the Statute of Limitations when the asserted acts of trespass and fiduciary duty breach continued well into the two-year time period leading up the filing of the Complaint on October 2, 2012?

4. Was it error for the court to dismiss [Appellants'] Civil Conspiracy claim at summary judgment when conversion served as at least one illegal act and when the jury could have reasonably inferred malice from Chase, PHS and Safeguard's deliberate and knowingly improper notice procedures?

Appellants' Brief at 5-6.

(Footnote Continued) ————————————

See Appellant's Brief at 41; R.R. at 2517a. Therefore, although several August 2018 trial court orders were at issue for the motions to quash, Appellants elected to limit their arguments to only the trial court's August 9, 2018 order.

<u>Pretrial Issues</u>

Before summarizing Appellants' arguments in support of their first two issues, we state the following as background. As noted above, Appellants filed their amended complaint in January 2013, and the parties agreed that the pleadings were closed in July 2013. Appellants began discovery in October 2013.

One year later, on October 10, 2014, the trial court issued a case management order. R.R. at 273a-74a. In relevant part, the order stated that discovery must be completed by March 16, 2015, Appellants' expert reports must be filed by April 16, 2015, and Appellees' expert reports must be filed by May 18, 2015. Order, 10/10/14, R.R. at 273a-74a.

On January 16, 2015, the trial court docketed Appellants' emergency motion seeking to stay or modify the trial court's October 10, 2014 case management order. R.R. at 286a.[7] In relevant part, the motion stated that Appellants' counsel was moving to withdraw and that Appellants needed time to retain new counsel, who in turn, required additional time to review the case. Id. at 288a. That same day, Charles Fedel, Esq., entered his appearance as counsel for Sampathkumar and NGX. The trial court denied

_____

[7] Motions practice in Westmoreland County requires a party to serve the motion in advance on the opposing party and then present the motion to the trial court. See generally Westmoreland Cty. Civ. R. W208.3(a). Therefore, the docketing dates do not necessarily reflect the service dates of motions.

the motion on January 16, 2015. Id. at 291a. Appellants did not identify any experts by the March 16, 2015 discovery deadline.

Appellants subsequently filed several motions to compel and for a protective order. Attorney Fedel argued at the hearing on Appellants' motions that because Appellees' counsel was "papering [him] to death," and he was a solo practitioner, he needed additional time. R.R. at 371a. The trial court countered that Attorney Fedel elected to represent Sampathkumar and NGX and did not have to accept the case, particularly just three months before the discovery deadline. Id. at 372a. The trial court ultimately denied the motions on April 22, 2015. On June 19, 2015, the trial court granted Attorney Fedel permission to withdraw.

Meanwhile, on May 18, 2015, Dennis Kusturiss, Esq., and Erica Wilson, Esq., entered their appearance for all Appellants, including Raghunathan, who was formerly pro se. On June 23, 2015, Appellants presented a second motion for a new case management order. Id. at 322a. Appellants contended that this was a complex case and that Appellees could not "articulate any substantive reasons why they would be prejudiced" by a discovery extension. Id. at 332a. Appellants asserted they actively pursued discovery and that Appellees obstructed and delayed discovery. Id. at 333a-34a. The trial court denied Appellants' motion on June 23, 2015. Id. at 8.19a.

The case was certified ready for trial on March 27, 2017, and the trial court ordered pre-trial memorandum by May 1, 2017. Appellants, after requesting extensions of time, filed their pre-trial statement, which identified five experts and included their reports. Id. at 2199a. Appellees moved to strike the expert reports, which the trial court granted on October 5, 2017. Id. at 2123a-24a.

In granting Appellees' motion to strike, the trial court reasoned as follows:

> Despite more than two years passing from the April 2015 deadline, and the repeated denials of requests to extend same, [Appellants] decided for the first time to submit . . . expert witnesses in their pre-trial statement . . . and attached expert reports for each witness. . . .
>
> [I]t is hard to look at the history of this case and not find prejudice to [Appellees]. This case has been pending for a period of five years. Prior to the [case management order (CMO)] in October 2014, no expert reports were provided. The CMO was necessary to provide structure to the discovery process. For a period of more than two years, [Appellees] relied on the CMO and the denials of [Appellants'] motions for extensions. Furthermore, [Appellees] relied on [Appellants'] failure to comply with the deadline in preparing their defense strategy. Although trial is not set in this matter, . . . a certificate of readiness [was filed] indicating that discovery was complete and a pre-trial conference was scheduled in the matter. [Appellees] would have relied on that representation, along with the history of this case, to reach the logical conclusion that no expert testimony would be presented by [Appellants]. As a result, [Appellees] had no way of anticipating that [Appellants] would submit expert reports at this late stage of the trial process.

Id. at 3-4 (formatting altered). Subsequently, Appellants filed a motion for reconsideration, which the trial court denied in an August 9, 2018 order. We

note that the trial court incorrectly stated that Appellants filed a certificate of readiness that discovery was complete. Id. at 4. The record establishes that Chase filed a certificate of readiness for trial, and Appellants did not object.

### Refusal to Extend Discovery Deadline

Turning to Appellants' issues on appeal, in support of their first issue, Appellants recap the procedural history and blame Appellees and the trial court for delaying the completion of discovery. Appellants' Brief at 47-48. Appellants argue that in December 2014, "there still existed a number of unresolved discovery disputes." Id. at 49. According to Appellants, prior counsel Attorney Terrell moved to withdraw and to stay or modify the trial court's case management order. Id. In Appellant's view, "there were less than three months left to complete discovery, Chase had still not yet provided substantive answers to discovery on the grounds that their 'investigation was still ongoing,' and there were still outstanding discovery disputes that had been pending for months." Id. at 49-50. Appellants conclude the trial court abused its discretion by denying the motion to stay or modify because Appellees "substantially contributed to or otherwise caused" the delays. Id. at 50. Appellants argue that the departure of Attorney Terrell "exacerbated the procedural delays" and Appellees "should not be permitted to benefit from the procedural morass that they themselves played the primary role in creating." Id. at 50-51.

Chase counters that the trial court "appropriately exercised its broad discretion to deny Appellants' requests for relief from discovery deadlines." Chase's Brief at 26. Chase, in turn, blames Appellants for failing to "diligently pursue discovery," and points out, among other things, that Sampathkumar and NGX elected to change their counsel midway through the case. Id. at 27-28. Chase points out that Appellants failed to take any depositions for twenty months. Id. at 27. Safeguard similarly argues that the trial court acted within its discretion. Safeguard's Brief at 18. The trial court reasoned that Appellants had several opportunities to, but failed to, establish the good cause necessary to modify the discovery deadlines. Trial Ct. Op., 10/5/17, at 4.

We review a trial court's order regarding discovery deadlines for an abuse of discretion. See Anthony Biddle Contractors, Inc. v. Preet Allied Am. St., LP, 28 A.3d 916, 922 (Pa. Super. 2011) (Biddle). A finding of an abuse of discretion requires "a showing of manifest unreasonableness, partiality, prejudice, bias, ill-will, or such lack of support in the law or record for the award to be clearly erroneous." Samuel-Bassett v. Kia Motors Am., Inc., 34 A.3d 1, 51 (Pa. 2011) (citation omitted). To the extent such discovery issues exist, it "is self-evident that such issues, which arise while the parties are independently conducting discovery, require the filing of a motion in order to obtain the court's attention." Kurian v. Anisman, 851 A.2d 152, 160 (Pa. Super. 2004) (citation omitted).

In Biddle, the trial court entered a CMO in June 2009, which set a discovery deadline in April 2010. Biddle, 28 A.3d at 920. The plaintiff joined two additional defendants in November 2009. Id. The additional defendants filed preliminary objections, which the trial court overruled in February 2010, and the additional defendants filed their answer and new matter in March 2010. Id. Shortly thereafter, the plaintiff served discovery and filed a motion to extend the discovery deadlines. Id. The trial court denied the plaintiff's motion, and the Biddle Court reversed, reasoning that the plaintiff had substantially complied with the June 2009 CMO. Id. at 924. The Biddle Court observed that "multiple [discovery] delays would disrupt the efficient and just administration of justice and would send a blatant message that case management deadlines are meaningless. When case management deadlines are violated with impunity the abusing party must be prepared to pay the consequences." Id. at 923 (citations and alterations omitted).

In Hill v. Kilgallen, 108 A.3d 934 (Pa. Cmwlth. 2015),[8] the plaintiff argued that the trial court abused its discretion by denying, among other items, her motion to extend the discovery deadline. Hill, 108 A.3d at 940.

_____

[8] "This Court is not bound by decisions of the Commonwealth Court. However, such decisions provide persuasive authority, and we may turn to our colleagues on the Commonwealth Court for guidance when appropriate." Petow v. Warehime, 996 A.2d 1083, 1089 n.1 (Pa. Super. 2010) (citation omitted).

In Hill, the plaintiff filed a complaint in August 2007, a first amended complaint in June 2009, and a second amended complaint in January 2010. Id. at 936-37. On July 16, 2012, the defendants moved for judgment of non pros or sanctions, claiming that the plaintiff waited almost sixteen months "to move the litigation forward." Id. at 938. On October 17, 2012, the plaintiff filed a motion to compel. Id. In January 2013, the trial court denied the defendants' motion and granted the plaintiff's motion to compel, ordering the defendants to respond to discovery within thirty days and that all parties complete depositions within ninety days. Id. In April 2013, the plaintiff filed a motion for sanctions, strike the defendants' objections to her discovery requests, and to extend the discovery deadlines, which the trial court denied. Id. at 938, 940.

The Hill trial court reasoned that the plaintiff was "at fault for many of the delays in discovery. [She] had initiated the underlying case six (6) years ago. During that time, [she] failed to get the necessary factual allegations to support her claim and failed to comply with the discovery rules . . . ." Id. at 941 (citation omitted). The Hill Court agreed that the trial court's reasoning was not an abuse of its discretion. Id.

Instantly, similar to Hill and unlike Biddle, Appellants did not timely initiate and pursue discovery. Cf. Hill, 108 A.3d at 941. Appellants, similar to the plaintiff in Hill, waited three months before initiating discovery and had almost two years to complete discovery and obtain the necessary factual

allegations to support their claims, including bringing any disputes to the trial court's attention. Cf. id. To the extent Appellants blame the trial court for delays, they did not file appropriate motions to move the matter forward. Cf. Kurian, 851 A.2d at 160. We note that although Appellants complained about having less than three months within which to complete discovery, the Hill Court affirmed the trial court's refusal to extend the discovery deadlines after ordering the parties to complete discovery within thirty days and complete depositions within three months. See Hill, 108 A.3d at 938.

Additionally, this case is distinguishable from the facts in Biddle, because Appellants did not add additional defendants and have the pleadings closed shortly before the discovery deadline. Cf. Biddle, 28 A.3d at 920. Unlike the plaintiff in Biddle, who complied with the CMO, Appellants had a year within which to pursue discovery even before the trial court issued its CMO. Cf. id. Moreover, Appellants, unlike the litigants in Biddle and Hill, chose to dismiss and retain new counsel several times. Under the circumstances, we cannot say that Appellants established the trial court acted with manifest unreasonableness, partiality, prejudice, bias, or ill-will. See Samuel-Bassett, 34 A.3d at 51. Therefore, even assuming Appellants had properly preserved their claim in a post-trial motion, it fails.

<u>Striking Appellants' Untimely Expert Reports</u>

In support of their second issue, Appellants argue that because the case had not yet been scheduled for trial, the trial court erred by striking

their experts' reports. Appellants' Brief at 56. Appellants summarize several cases, which in their view, establish that Appellants did not act in bad faith. Id. at 65. They argue that the delay in producing the reports was "not to the product of artifice or design," but was the result of "extenuating circumstances." Id. at 66. Specifically, Appellants claim that "the departure of two separate attorneys, the time necessary for newly engaged attorneys to consume the boxes of material developed in both the foreclosure and the underlying proceedings, the difficulty obtaining requested discovery from" Appellees. Id. Appellants maintain that they did not act "in a callous and indifferent manner towards the court-imposed deadlines" in the trial court's October 9, 2014 case management order. Id. Appellants argue that Appellees "would have suffered no prejudice whatsoever" if the trial court permitted their expert reports. Id. at 67.

We review an evidentiary ruling resolving the admissibility of expert testimony/reports for an abuse of discretion. First Lehigh Bank v. Haviland Grille, Inc., 704 A.2d 135, 139 (Pa. Super. 1997) (stating, "[d]iscovery sanctions are appropriate where a party fails to make discovery or to obey an order of court respecting discovery." (citation omitted and formatting altered)).

> One of the primary purposes of discovery is to prevent the surprise and unfairness of a trial by ambush, in favor of a trial on the merits. Parties may discover the evidence that will be offered at trial, and assess the credibility of witnesses. Consequently, discovery is calculated to facilitate early settlement or narrow issues for trial.

Gregury v. Greguras, 196 A.3d 619, 628 (Pa. Super. 2018) (en banc).

Pennsylvania Rule of Civil Procedure 4003.5 addresses discovery of expert testimony:

> (a) Discovery of facts known and opinions held by an expert, otherwise discoverable under the provisions of Rule 4003.1 and acquired or developed in anticipation of litigation or for trial, may be obtained as follows:
>
> > (1) A party may through interrogatories require
> >
> > > (A) any other party to identify each person whom the other party expects to call as an expert witness at trial and to state the subject matter on which the expert is expected to testify and
> > >
> > > (B) subject to the provisions of subdivision (a)(4), the other party to have each expert so identified state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion. The party answering the interrogatories may file as his or her answer a report of the expert or have the interrogatories answered by the expert. . . .
>
> * * *
>
> (b) An expert witness whose identity is not disclosed in compliance with subdivision (a)(1) of this rule shall not be permitted to testify on behalf of the defaulting party at the trial of the action. However, if the failure to disclose the identity of the witness is the result of extenuating circumstances beyond the control of the defaulting party, the court may grant a continuance or other appropriate relief.

Pa.R.C.P. 4003.5(a)(1), (b).

"The purpose of the discovery rules is to prevent surprise and unfairness and to allow a trial on the merits." Kaminski v. Employers

Mut. Cas. Co., 487 A.2d 1340, 1344 (Pa. Super. 1985) (citation omitted).

The Kaminski Court explained:

> When expert testimony is involved, it is even more crucial that surprise be prevented, since the attorneys will not have the requisite knowledge of the subject on which to effectively rebut unexpected testimony. By allowing for early identity of expert witnesses and their conclusions, the opposing side can prepare to respond appropriately instead of trying to match years of expertise on the spot. Thus, the rule serves as more than a procedural technicality; it provides a shield to prevent the unfair advantage of having a surprise witness testify.

Kaminski, 487 A.2d at 1344-45.

In Curran v. Stradley, Ronon, Stevens & Young, 521 A.2d 451 (Pa. Super 1987), the Court summarized the trial court's framework for evaluating a Rule 4003.5 violation:

> Specifically, the Court stated that where an expert witness has not been identified pursuant to a local or state discovery rule, the presiding court must balance the facts and circumstances of each case to determine the prejudice to each party[:]
>
> Bad faith on the part of the party seeking to call witnesses not listed in his pretrial memorandum; ability of the party to have discovered the witnesses earlier; validity of the excuse offered by the party; willfulness of the party's failure to comply with the court's order; the [party's] intent to mislead or confuse his adversary; and finally, the importance of the excluded testimony. Underlying the cases to which we have adverted are these basic considerations: (1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in the court, and (4) bad faith [or] willfulness in failing to comply with the court's order.

Curran, 521 A.2d at 457 (emphasis added, citations omitted, and formatting altered).

Here, the instant trial court reasoned as follows:

[I]t is hard to look at the history of this case and not find prejudice to [Appellees]. This case has been pending for a period of five years. Prior to the CMO in October 2014, no expert reports were provided. The CMO was necessary to provide structure to the discovery process. For a period of more than two years, [Appellees] relied on the CMO and the denials of [Appellants'] motions for extensions. Furthermore, [Appellees] relied on [Appellants'] failure to comply with the deadline in preparing their defense strategy. . . . As a result, [Appellees] had no way of anticipating that [Appellants] would submit expert reports at this late stage of the trial process. . . . As a result, this Court finds that [Appellees] are prejudiced by [Appellants'] excessively late disclosure of expert reports and testimony.

Trial Ct. Op., 10/5/17, at 4-5 (footnote omitted).

Instantly, we perceive no abuse of discretion in the trial court's reasoning. See First Lehigh Bank, 704 A.2d at 139. The trial court's CMO required Appellants to identify their experts by April 16, 2015, and Appellants failed to comply. Appellants' present counsel, who entered their appearance in May 2015, were well aware that no experts were identified by the deadline, but nonetheless chose to proceed with representing Appellants. Appellants ultimately filed their pretrial memorandum attaching five new expert reports on August 4, 2017. Trial by ambush or surprise, however, is not favored in this Commonwealth. See Gregury, 196 A.3d at 628. While we acknowledge that the trial court had not yet scheduled trial, Appellants' springing of new expert reports on Appellees is disfavored. See Curran,

521 A.2d at 457. Therefore, even if Appellants had raised this claim in a post-trial motion, they failed to establish an abuse of discretion. See First Lehigh Bank, 704 A.2d at 139.

### Motion for Summary Judgment Issues

Before summarizing the arguments for Appellants' last two claims, we state the following as background. Appellants raised a claim for trespass, as follows:

> 55. Even though . . . Sampathkumar and Raghunathan were absent from the property for an extended period of time, [Appellees], jointly and severally, knew or should have known, that [Appellants] did not abandon their residence. At no time did [Appellants], either jointly or severally, provide or give [Appellees], the reasonable right to enter the residence and change the locks. [Appellants] did not consent to any named [Appellee] entering the residence. No [Appellee] provided any named [Appellant] here with notice of their intention to enter upon or seize [Appellants'] real or personal property.
>
> 56. [Appellees'] unlawful entry, jointly and severally, without any legal or factual authority, upon [Appellants'] residence; and [Appellees'], joint and several, willful and intentional failure and refusal to relinquish control of [Appellants'] residence has continued wrongfully and illegally August 2008—to date.
>
> 57. [Appellees'] retention and control of [Appellants'] residence is continuing in nature and contrary to [Appellants'] titled ownership and/or equitable rights.

R.R. at 220a-21a.

> Appellants' claim for conspiracy follows:
>
> 79. The agreement between [Appellees] to forcibly enter [Appellants'] residence, without legal right, or other lawful authority, or consent, was illegal and in violation of [Appellants'] right to peacefully and quietly enjoy [their] home. [Appellees'] agreement constitutes a joint venture and a civil conspiracy.

Id. at 226a.

Safeguard filed a motion for summary judgment, which the trial court granted in part on March 1, 2016, as to all claims except Appellants' conversion claim. R.R. at 2116a. Chase and MERS also filed a motion for summary judgment for all claims. In relevant part, Appellees argued that the statute of limitations barred Appellants' trespass claim. See, e.g., R.R. at 527a-28a.

Appellants filed their opposition, arguing that the discovery rule should toll the statute of limitations because they were incarcerated. Id. at 1741a-42a. Sampathkumar stated she did not return to Pittsburgh until October 2010. Id. at 1742a. Raghunathan and NGX claimed they did not discover that Appellees removed property from the residence until February of 2011. Id. They argued that Appellees were liable for the trespass, "which is a continuing trespass because of the refusal to return possession of the Residence to" Appellants. Id. at 1745a (citing Allegheny v. Merrit Const. Co., 454 A.2d 1051 (Pa. Super. 1982)). Appellants also did not argue that because they were denied an extension of time for discovery, they could not identify controverting evidence. Id.; see generally Pa.R.C.P. 1035.3. The trial court granted in part and denied in part summary judgment.

Specifically, the trial court granted summary judgment for all claims except for Appellants' conversion and UTPCPL claims.[9]  Id. at 1745a.

<u>Summary Judgment on Appellants' Trespass Claim</u>

On appeal, in support of their third claim, Appellants argue that the trial court erred in granting summary judgment adverse to them for their claims of trespass against both Chase and Safeguard and breach of fiduciary duty against Chase.  Appellants' Brief at 70.  With respect to trespass, Appellants acknowledge there is a two-year statute of limitations but that the discovery rule tolled it.  Id. at 74.  Appellants note that a trespass is "continuing when it is impossible to know exactly how many incidents of trespass will occur in the future, or the severity of the damage that may be caused, such that the full amount of damages cannot be calculated in a single action."  Id. at 73.  Appellants, however, state that Chase possessed the Residence in "June of 2008 to at least mid-2016."  Id. at 8, 26.

In Appellants' view, although they were aware of the mortgage default and foreclosure proceedings in August of 2008, they assert they were unaware of the "damages, injuries or loss associated with that trespass until February of 2011 . . . ."  Id. at 73.  Specifically, that month, "Raghunathan

_____

[9] PHS also moved for summary judgment on the remaining claims against it, which the trial court granted for all claims except for the breach of fiduciary duty claim.  Id.  MERS and PHS filed motions for reconsideration, which the trial court granted on August 8, 2016, and dismissed all claims against MERS and PHS.  Id. at 2187a-88a.

entered the premises (after serving his sentence) and found a number of items of damage, including certain household items and furnishings that were missing and unaccounted for, the missing NGX intellectual property, and physical damage and disrepair to the residential property itself." Id. at 73-74 (footnote omitted).[10] Therefore, Appellants assert, since the discovery rule tolls the statute of limitations, they timely filed their complaint in October 2012. Id. at 74. Appellants additionally claim that "the court erred by not tolling the statute of limitations due to the concealment of information regarding Safeguard's identity and involvement by Chase, MERS, and PHS." Id. at 76.

The trial court held as follows in granting summary judgment adverse to Appellants:

When the foreclosure action was initiated by Chase against [Sampathkumar and Raghunathan, they] were incarcerated and arranged for a family member to make payments on the mortgage. [Sampathkumar] was incarcerated until her release on August 20, 2010. [Raghunathan] was incarcerated until his release, which he alleges occurred on February 20, 2011. Pursuant to 42 Pa.C.S.[] § 5533(a), incarceration does not extend the statute of limitations on a cause of action. Despite their incarceration, [Appellants] admit in their amended complaint that they first became aware of the foreclosure action filed by Chase on August 18, 2008. They further acknowledge that they knew the locks were changed on their residence as of August 9, 2009. Throughout the process, [Appellants] sent letters to all [Appellees] requesting information and also participated in the foreclosure proceeding by attempting to set

_____

[10] We discuss the absence of record support for this assertion below.

aside the default judgment and delay the sheriff's sale that was initially scheduled in 2008. Based on these facts, it is clear that [Appellants] were aware, or should have been aware, of the injury against them in the form of trespass and breach of a fiduciary duty when the foreclosure action came to their attention in August 2008, when the residence was scheduled for sheriff's sale in 2008, and when they knew the locks on their residence were changed in August 2009. Reasonable minds could not differ as to whether [Appellants] were aware of the injury against them in relation to trespass and breach of a fiduciary duty. Since [Appellants] did not file their initial complaint alleging said claims until October 2, 2012, they were well outside the two year statute of limitations and they should be barred from proceeding on said claims as a result.

Trial Ct. Op. at 4-5.

Our standard of review for summary judgment is well-settled:

In reviewing an order granting summary judgment, our scope of review is plenary, and our standard of review is the same as that applied by the trial court. . . .

An appellate court may reverse the entry of a summary judgment only where it finds that the lower court erred in concluding that the matter presented no genuine issue as to any material fact and that it is clear that the moving party was entitled to a judgment as a matter of law. In making this assessment, we view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. As our inquiry involves solely questions of law, our review is de novo.

Thus, our responsibility as an appellate court is to determine whether the record either establishes that the material facts are undisputed or contains insufficient evidence of facts to make out a prima facie cause of action, such that there is no issue to be decided by the fact-finder. If there is evidence that would allow a fact-finder to render a verdict in favor of the non-moving party, then summary judgment should be denied.

Jones v. Levin, 940 A.2d 451, 453-54 (Pa. Super. 2007) (citations omitted and formatting altered).

Upon raising a claim "sounding in trespass, whether continuing or permanent," the statute of limitations is two years. See Kowalski v. TOA PA V, L.P., 206 A.3d 1148, 1160 n.6 (Pa. Super. 2019) (citing 42 Pa.C.S. § 5524(4)). The "discovery rule," however, establishes an exception to when the statute of limitations typically begins to run:

> The discovery rule is a judicially created device which tolls the running of the applicable statute of limitations until that point when the plaintiff knows or reasonably should know: (1) that [the plaintiff] has been injured, and (2) that [the] injury has been caused by another party's conduct. The limitations period begins to run when the injured party possesses sufficient critical facts to put him on notice that a wrong has been committed and that he need investigate to determine whether he is entitled to redress.

Melley v. Pioneer Bank, N.A., 834 A.2d 1191, 1201 (Pa. Super. 2003) (emphasis added and citation omitted).[11] "Absent issues pertaining to the discovery rule, whether the statute of limitations has run on a claim is generally a question of law for the trial court judge." Wilson v. Transport Ins. Co., 889 A.2d 563, 570 (Pa. Super. 2005) (citation omitted and

---

[11] "In short, the discovery rule is a judicial creation, fashioned to solve a specific problem, namely, whether the law should preclude recovery for an injury that not even a diligent party may reasonably be expected to discover." Anthony v. Koppers Co., 425 A.2d 428, 432 (Pa. Super. 1980) (discussing origin and history of discovery rule), rev'd, 436 A.2d 181 (Pa. 1981).

formatting altered). While the application of the discovery rule is ordinarily a question of fact, where reasonable minds would not differ as to its application, the lower court may make the determination as a matter of law. O'Kelly v. Dawson, 62 A.3d 414, 419 (Pa. Super. 2013).

"The party seeking to invoke the discovery rule bears the burden of establishing the inability to know of the injury despite the exercise of reasonable diligence." Dalrymple v. Brown, 701 A.2d 164, 167 (Pa. 1997). The reasonable diligence standard "is not a standard of reasonable diligence unique to a particular plaintiff, but instead a standard of reasonable diligence as applied to a 'reasonable person.'" Id. "[T]he point at which the complaining party should reasonably be aware that he has suffered an injury is generally an issue of fact to be determined by the jury; only where the facts are so clear that reasonable minds cannot differ may the commencement of the limitations period be determined as a matter of law." E.J.M. v. Archdiocese of Phila., 622 A.2d 1388, 1391 (Pa. Super. 1993) (citation omitted); accord O'Kelly, 62 A.3d at 420. In the context of summary judgment, the trial court inquires "whether there are genuine issues of material fact as to whether [the plaintiff] knew or was unable to know, despite the exercise of reasonable diligence, that she was injured and by what cause at the time the injury was inflicted." Fine v. Checcio, 870 A.2d 850, 863 (Pa. 2005).

As set forth above, Appellants contend that Appellees engaged in a continuing trespass, which they were unaware of until February 2011. We begin by defining a continuing trespass:

> The Restatement (Second) of Torts defines a continuing trespass as follows:
>
>> The actor's failure to remove from land in the possession of another a structure, chattel, or other thing which he has tortiously erected or placed on the land constitutes a continuing trespass for the entire time during which the thing is wrongfully on the land and . . . confers on the possessor of the land an option to maintain a succession of actions based on the theory of continuing trespass or to treat the continuance of the thing on the land as an aggravation of the original trespass.

Kowalski, 206 A.3d at 1161 n.7 (emphasis added, citations omitted, and formatting altered); accord Merrit, 454 A.2d at 1052.

> Specifically:
>
> A continuing trespass must be distinguished from a trespass that effects a permanent change in the condition of the land. The latter, while resulting in a continuing harm, does not subject the trespasser to liability for a continuing trespass. If a nuisance at the time of creation is a permanent one, the consequences of which in the normal course of things will continue indefinitely, there can be but a single action therefore to recover past and future damages and the statute of limitations runs against such cause of action from the time it first occurred, or at least from the date it should reasonably have been discovered.

Merrit, 454 A.2d at 1053 (citation omitted and formatting altered); accord Kowalski, 206 A.3d at 1160-61, 1168 (stating, "in the context of a continuing trespass, a right of action exists only for the damages suffered within the statutory period immediately preceding suit.").

In determining whether a trespass is permanent or continuing:

a court must consider a variety of factors, including: (1) the character of the structure or thing which produces the injury; (2) whether the consequences of the trespass will continue indefinitely; and (3) whether the past and future damages may be predictably ascertained.

For a trespass that effects a permanent change in the condition of the land, the statute of limitations begins to run at the time of the original trespass, or at least from the date it should reasonably have been discovered. The possessor of the land may then institute a single action to recover past and future damages for a permanent trespass. Since a permanent trespass once and for all produces a permanent injury to the land, only the possessor of the land at the time of the trespass has a cause of action for the trespass.

Conversely, where it is impossible to know exactly how many incidents of trespass will occur in the future, or the severity of the damage that may be caused, such that the full amount of damages cannot be calculated in a single action, the trespass is continuing. The possessor may maintain a succession of actions based on the continuing trespass or treat the continuance of the thing on the land as an aggravation of the original trespass.

Kowalski, 206 A.3d at 1160-61 (citations omitted).

In Graham Oil Co. v. BP Oil Co., 885 F. Supp. 716 (W.D. Pa. 1994), the federal district court summarized the Pennsylvania law on a continuing trespass in resolving whether to dismiss the plaintiff's trespass claim. Graham Oil, 885 F. Supp. at 718.[12] Specifically, the plaintiff leased property to the defendant, who used it as a gas and service station and

_____

[12] Although federal court decisions do not typically bind this Court, we may rely on them to the extent we find their reasoning persuasive. NASDAQ OMX PHLX, Inc. v. PennMont Secs., 52 A.3d 296, 303 (Pa. Super. 2012).

installed underground storage tanks. Id. In January 1992, the defendant removed the storage tanks and later notified the plaintiff that it would allow its lease to expire in November 1992. Id. In April 1994, the plaintiff filed an amended complaint against the defendant for, among other claims, a continuing trespass. Id.

The defendant filed a motion to dismiss the continuing trespass claim on several grounds,[13] including that its alleged contamination was a permanent trespass and not a continuing trespass. Id. at 725. The Graham Oil court summarized the Pennsylvania law on the distinctions between a continuing and a permanent trespass, as well as the similar case of Tri-County Bus. Campus Joint Venture v. Clow Corp., 792 F. Supp. 984 (E.D. 1992). Id. at 725-26 (stating that in Clow, the district court held that "the defendant's depositing of drums and associated waste on the property did not constitute a continuing trespass because the depositing of waste was a completed act at the time that the property was conveyed." (citation omitted)).

In granting the defendant's motion to dismiss, the Graham Oil court reasoned, among other things, that in "order to maintain a claim for continuing trespass, a plaintiff must plead that the defendant committed and

_____

[13] We note that one ground was that the defendant "was a tenant-in-possession of the premises at the time of the alleged contamination and its presence was, therefore, authorized." Graham Oil, 885 F. Supp. at 725.

continues to commit harm-causing actions, not merely that the harm continues to result from actions which have ceased." Id. at 726 (citations omitted). The district court reasoned that because the "contamination was a completed act at the time the underground storage tanks were removed and that the contamination is, therefore, a permanent injury rather than a continuing trespass." Id. at 727.

Initially, we address Appellants' contention that they did not discover their injuries until February 2011, when Raghunathan entered the Residence after completing his sentence. See Appellant's Brief at 73-74. Appellants cited nothing of record to support their contention that Raghunathan entered the Residence in February 2011. The trial transcript revealed that Raghunathan testified he discovered his property was missing when he "tried to move stuff from Bumbaugh's office" to another location. R.R. at 67b. Sampathkumar testified that Raghunathan had "gone by the" Residence in February 2011, but she did not testify that Raghunathan entered the Residence. Id. at 378b, 423b. In any event, imprisonment does not toll the statute of limitations. 42 Pa.C.S. § 5533(a).

Further, Appellants did not identify material issues of fact regarding Appellees' "failure to remove from land in the possession of another a structure, chattel, or other thing" that Appellees "tortuously erected or placed on the" Residence. See Kowalski, 206 A.3d at 1161 n.7 (citation omitted). Appellants conceded they did not possess the Residence between

October 2, 2010, and October 2, 2012, the date they filed suit.[14]   See
Appellants' Brief at 8, 26 (stating Chase possessed the Residence between
June 2008 to mid-2016); cf. Graham Oil, 885 F. Supp. at 725 (noting the
alleged tort occurred while the defendant was in possession of the property).

To the extent Appellants rely on Appellees' alleged unlawful entry as
the basis for their continuing trespass claim, that unlawful entry was
completed in June 2008.  See Trial Ct. Op. at 5-6.  Considering that unlawful
entry is the legal equivalent to a tortious placement of a structure, chattel,
or other thing, similar to the contamination in Graham Oil, Appellees'
unlawful entry was completed in June 2008.[15]   Cf. Graham Oil, 885 F.
Supp. at 725-26.  Therefore, the statute of limitations ran in June 2010.
See 42 Pa.C.S. § 5524(4).

Regardless, Appellants also failed to identify, let alone state any
material issues of fact regarding, any "structure, chattel, or other thing" that
Appellees "tortuously erected or placed on the" Residence such that
Appellees committed a continuing trespass.   See Kowalski, 206 A.3d at
1160-61 & 1161 n.7; see also Merrit, 454 A.2d at 1053.  Appellants did not

_____

[14] As discussed above, the Residence was sold at a sheriff's sale on
November 10, 2010.  On November 12, 2012, Chase "voluntarily vacated
the default judgment" and set aside the Sheriff's Sale.  Trial Ct. Op. at 11.

[15] We acknowledge the trial court's and Appellees' reasoning that their
presence in the Residence was lawful under the mortgage instrument.  See,
e.g., Trial Ct. Op. at 1.

cite any authority for the proposition that Appellees' "refusal to relinquish control" of the Residence is equivalent to the failure to remove a tortious erection or placement of a structure, chattel, or other thing. See Kowalski, 206 A.3d at 1161 n.7.

Even if we accepted Appellants' contention that Appellees' "refusal to relinquish control" is a valid "continuing trespass," we agree with the trial court's reasoning regarding the discovery rule. See Trial Ct. Op. at 4-5. First, Appellants' incarceration did not toll the statute of limitations. See 42 Pa.C.S. § 5533(a). Second, Appellants simply failed to identify any material issues of fact that they could not have discovered their injury earlier. Appellants acknowledge they learned of Appellees' possession of the Residence in June 2008, testified they learned of the sheriff's sale in July of 2008, and successfully sought to delay the sale in August 2008. Indeed, Appellants' family and friends entered the Residence in August 2008 to retrieve Appellants' personal belongings and photographs were taken of the Residence. See Trial Ct. Op. at 7. Appellants, however, filed suit over four years later, on October 2, 2012. Appellants do not explain why they could not have discovered the basis of the trespass claim—Appellees' alleged refusal to return the Residence—until on or after October 2010. Finally, with respect to Appellants' claim of damages, they were aware that their personalty was retrieved in August 2008. Appellants do not explain how, despite the August 2008 retrieval, they remained unaware of the "damages,

injuries or loss associated with that trespass until February of 2011 . . . ." See Appellant's Brief at 73. Therefore, after carefully construing the record in their favor, we agree with the trial court that Appellants failed to identify any genuine issues of material fact regarding the disposition of their continuing trespass claim. See Jones, 940 A.2d at 453-54.

<u>Summary Judgment on Appellants' Conspiracy Claim</u>

Lastly, Appellants challenge the trial court's conclusion that there was a "lack of factual evidence supporting malicious intent" by Appellees. Appellant's Brief at 83. In Appellants' view, no caselaw holds for the proposition that they must prove that Appellees' "actions were motivated solely for the purpose of" injuring Appellants. Id. at 84 (emphasis in original). Citing to federal district court cases, Appellants argue that they "need only show sufficient factual evidence to support an inference that" Appellees were motivated, at least in part, to injure Appellants. Id. Appellants then list numerous actions by Appellees, which Appellants claim establish that one of Appellees' motives was "to play 'fast-and-loose' with [Appellants'] due process rights for the illegitimate purpose of keeping them in the dark as to what they were planning in connection with the" Residence. Id. at 86 (emphasis in original).

Chase counters that Appellants failed to identify facts establishing Appellees' conspiracy, the "cause of action for which a conspiracy occurred," and malice. Chase's Brief at 56. In Chase's view, even after viewing the

record in Appellants' favor, "Appellants failed to present evidence that Appellees' 'sole purpose in bringing the foreclosure action was to injure'" Appellants. Id. at 57. Chase also takes issue with Appellants' reliance on federal caselaw permitting evidence of a mixed motive, as opposed to the Pennsylvania Supreme Court's sole-purpose motive. Id. Chase notes that even if Appellants met their evidentiary burden, their claim was barred by the two-year statute of limitations. Id. at 59-60. Safeguard similarly counters that Appellants failed to identify any material issues of fact that they conspired with Chase or any other Appellees. Safeguard's Brief at 50-51.

> By way of background:
>
> In order to state a cause of action for civil conspiracy, a plaintiff must show that two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means. Proof of malice, i.e., an intent to injure, is essential in proof of a conspiracy. Thus, in order to withstand summary judgment on this claim, [the plaintiffs] must have produced evidence which would establish that [the defendants] acted in concert to commit an unlawful act or do a lawful act by unlawful means, and that they acted with malice.

Commerce Bank/Pa. v. First Union Nat'l Bank, 911 A.2d 133, 143 (Pa. Super. 2006) (citations omitted and formatting altered); accord Williams v. Lead Indus. Ass'n, Inc., 690 A.2d 169, 174 (Pa. 1997). A plaintiff must establish a valid underlying civil claim before it can prevail on a civil conspiracy claim. See Rock v. Rangos, 61 A.3d 239, 249 (Pa. Super. 2013). The Rock Court affirmed the dismissal of the plaintiff's civil

conspiracy claim because there was no valid underlying civil claim. Rock, 61 A.3d at 249 (noting "conspiracy claim will not lie without a valid underlying civil claim" (citations omitted)).

As set forth above, because Appellants failed to establish the trial court erred in granting summary judgment regarding their underlying trespass claim, they cannot prevail on appeal regarding their conspiracy claim. See id. We add that the jury did not find there was any conversion and Appellants have not challenged the jury's verdict as to conversion. Therefore, Appellants have no basis to argue that the trial court erred in granting summary judgment on their claim of civil conspiracy as to conversion, because without any predicate cause of action, their civil conspiracy claim must fail as a matter of law. See Phillips v. Selig, 959 A.2d 420, 437 (Pa. Super. 2008); see also Lackner v. Glosser, 892 A.2d 21, 35 (Pa. Super. 2006) (noting "a conspiracy is not actionable until some overt act is done in pursuance of the common purpose or design and actual legal damage results." (citation omitted and formatting altered)). For these reasons, we affirm the trial court's judgment.

Judgment affirmed. Safeguard's and Chase's motions to quash granted in part and denied in part. Appellants' appeals quashed in part.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 10/19/2020